IN THE MATTER OF THE SWORN APPLICATION OF JULIA TIENE AND OTHER FREEHOLDERS OF THE CITY OF JERSEY CITY IN THE COUNTY OF HUDSON FOR A SUMMARY INVESTIGATION INTO THE MUNICIPAL EXPENDITURES OF THE CITY OF JERSEY CITY.

JULIA TIENE, *ET ALS.*, APPLICANTS-RESPONDENTS, v. CITY OF JERSEY CITY, DEFENDANT AND COUNTER APPLICANT-APPELLANT.

Argued October 22, 1953—Decided November 9, 1953.

*Mr. Mortimer Neuman* argued the cause for the appellant (*Mr. John B. Graf*, attorney).

*Mr. Murray Greiman* argued the cause for the respondents.

The opinion of the court was delivered by

VANDERBILT, C. J. On January 28, 1953, 49 freeholders of Jersey City filed with Judge Proctor, the Assignment Judge of the Superior Court for Hudson County, their sworn application for a summary investigation into the affairs of the city under *R. S.* 40:6–1 which provides:

> "If twenty-five freeholders in any municipality or county shall present to any justice of the supreme court an affidavit, sworn to and subscribed by them, setting forth that they are freeholders and have paid taxes on real estate within one year, and that they have cause to believe that the moneys of such municipality or county, are being, or have been unlawfully or corruptly expended, or, if the board of chosen freeholders of any county, or the legislative body of such municipality, by resolution, shall request such justice to investigate the affairs of the municipality or county making such request, such justice may, in his discretion, make a summary investigation into the affairs of such county or municipality. He may, at his discretion, appoint experts to prosecute such investigation, and may cause the results thereof to be published in such manner as he may deem proper."

The application is 27 pages long and to it are attached more than 500 pages of affidavits and exhibits in support of the charges of unlawful or corrupt expenditures made in the application. The application dealt with such varied matters as the so-called "Pier B deal," "the Old Ball Park deal," the "Parking Meter deal," "the car-fleet rental deal," "the Bowl deal," "the Garbage deal," the habitual evasion of public-bidding statutes in making municipal purchases, padded payrolls, and "no-show" jobs.

On January 29, 1953 Judge Proctor made an order to show cause, the return date of which was at the city's request continued to February 26, 1953. On February 24, 1953, two days before the continued return day, the city gave notice of a motion, asking, among other things, that

the court permit the city to take the depositions of the applicants to determine their good faith and financial worth, that the court hold a hearing to determine the probable cost of the investigation and whether such cost would be warranted, that the applicants be required to post a bond to cover the cost of the investigation, that the investigation be deferred until after the oncoming commission government election on May 12, 1953, and that if an investigation should be ordered, it be extended to include the acts of the prior city administration back at least to 1917. This application is consonant with *R. S.* 40 :6–1, *supra.* On the day before the continued return day the city, by way of defense, adopted a lengthy resolution which in ordinary print would have run to 125 pages, supported merely by a brief and a formal affidavit of the mayor that the matters and things contained in the resolution were true to the best of his knowledge, information and belief.

On February 26, 1953 Judge Proctor heard oral argument at great length, the printed transcript covering 270 pages. On March 27, 1953 he found that the application established the jurisdictional prerequisites presented by *R. S.* 40 :6–1, and in the exercise of his discretion he came to the conclusion that the record before him

"leads the court to believe that the ends of justice will best be served by a summary investigation into the financial affairs of the City of Jersey City, as such investigation will serve as a proper means of ascertaining the truth of the facts and circumstances of the allegations."

In dealing with the request of the city that if an investigation should be ordered that it go back at least to 1917, he held:

"The investigation will not be limited as to time, or as to any particular administration. The scope of the investigation cannot be determined in advance. It may well appear during the progress of the investigation that an inquiry into the conduct of prior administrations in relation to the financial affairs of the city will be warranted."

and he ordered the posting of a bond for $10,000 by the applicants.

This decision was followed by motions for a rehearing, for a stay pending appeal, and to vacate previous orders, which were denied, and by an application by the expert appointed by the court under the statute to prosecute the investigation to compel the city to make available its financial records, which was granted.

The city appealed to the Appellate Division of the Superior Court from the trial court's order directing an investigation and we have certified the appeal on our own motion.

The city urges various grounds of appeal:

1. At the outset the city argues that the assignment judge was without jurisdiction over the application. Relying on the exception in *Art.* XI, *Sec.* IV, *par.* 10 of the *Constitution,* it claims that at the time the application was filed, the power to act under the statute was vested solely in the chief justice of the Supreme Court. By *par.* 10 "all the functions, powers and duties conferred by statute, rules or otherwise" upon the "judges of the courts abolished by this Constitution," (which includes the former Supreme Court) "shall be transferred to and may be exercised by Judges of the Superior Court until otherwise provided by law or rules of the new Supreme Court;

"excepting that such statutory powers not related to the administration of justice as are then vested in any such judicial officers shall, after the Judicial Article of this Constitution takes effect and until otherwise provided by law, be transferred to and exercised by the Chief Justice of the new Supreme Court."

The city claims that the power here exercised by the assignment judge was not related to the administration of justice and therefore under the quoted exception it was vested in the chief justice.

This view ignores the decision of our court construing this very statute, *R. S.* 40:6–1, *supra.* In *Massett Building Co. v. Bennett,* 4 *N. J.* 53 (1950), we had occasion to consider this statute for the first time under the new Constitution,

and after an exhaustive examination of the authorities we upheld its constitutionality. There, as here, "the plaintiffs contend that the act in question charges a judge with the performance of nonjudicial duties" (*p.* 56), but the answer of a unanimous court was clear:

"It is still to be demonstrated that an investigation into the affairs of local government is not judicial. * * * Judicial investigations are of the most varied sorts, ranging from grand jury investigations to the taking of testimony in proceedings in lieu of prerogative writs, from discovery proceedings to investigations by probation officers in aid of the court in imposing sentences. It cannot be said an investigation into the public affairs of a municipality or a county is not judicial in nature when it may lead to a civil suit for damages, or a proceeding in lieu of a prerogative writ, or a grand jury indictment or any one of a variety of statutory actions. That the statute stops short with a publication of the results thereof does not prevent the action being judicial in character, for it may lead to subsequent judicial action." (*pp.* 58–59)

The conclusions there reached as to the constitutionality of the act and the judicial nature of the proceedings are in accord with earlier proceedings under the *Constitution of 1844*, from *North Bergen v. Gough*, 107 *N. J. L.* 424, at *pp.* 430–431 (*Sup. Ct.* 1931), where the use of process out of the Supreme Court under its seal was approved, to *In re Wellhofer*, 137 *N. J. L.* 342, 346 (*Sup. Ct.* 1948), where Mr. Chief Justice Case remarked:

"Finally, as point nine, it is contended that the statute itself is unconstitutional. The contrary has been held too often to require fresh consideration here. *North Bergen Township v. Gough, supra; Newark v. Parker*, [119 *N. J. L.* 225 (*Sup. Ct.* 1937)]; *Hoboken v. O'Neill*, 74 *N. J. L.* 57 (*Sup. Ct.* 1906); *Park Ridge v. Reynolds*, 74 *N. J. L.* 449 (*E. & A.* 1906)."

 But the city nevertheless contends that the assignment judge was without power under *L.* 1948, *c.* 375, *sec.* 1(*i*) (*N. J. S. A.* 1:1–22(*i*)), an act implementing the section of the Constitution we have been considering and providing:

"Where the reference is to a former Supreme Court Justice, as the Supreme Court Justice presiding in a circuit, or in such terms

as indicate that the reference is to such former officer while performing his duty of presiding in or over the circuit of the former Supreme Court of a county, it shall be given effect as though it were to such Judge of the Superior Court as is assigned in a similar capacity in the county if any such Judge is so assigned, otherwise as though it were to a Judge of the Superior Court assigned to the Law Division thereof in the county."

The gist of the city's contention is that the statute refers exclusively to the judicial powers of the former Supreme Court justices, and that the power here exercised by the assignment judge is not such a judicial power. This view, however, overlooks the holding in the *Massett Lumber Company* case, supra, upholding the assignment judge's power to act under the very statute here under review, in the express ruling of this court in that case:

"On September 15, 1948, the Honorable Frank T. Lloyd, Jr. was designated as Assignment Judge of the Law Division of the Superior Court in Atlantic County and by virtue of *R. S.* 1:1–22(*i*) took over the authority theretofore exercised by Judge Eastwood."

Nor does *L.* 1953, *c.* 37 (*N. J. S. A.* 40:6–1 *et seq.*), enacted after the commencement of this proceeding, serve the city. In providing that "A judge of the Superior Court may, in his discretion, make a summary investigation" (*N. J. S. A.* 40:6–1) and that he "may (a) exercise the subpoena powers of and out of the Superior Court * * *; and may enforce such subpoenas in similar manner as in civil actions in the Superior Court; (b) take or order the obtaining of evidence and the taking of testimony, by deposition or otherwise, in similar manner as in civil actions generally" (*N. J. S. A.* 40:6–3), the Legislature was merely giving legislative recognition to the construction placed by the courts on *R. S.* 40:6–1 and *N. J. S. A.* 1:1–22(*i*), both under the *Constitution of* 1844 and the *Constitution of* 1947. *L.* 1953, *c.* 37 was one of a series of bills, *L.* 1953, *c.* 4 to *c.* 57, recommended to the Legislature by its Advisory Committee on the Revision of Statutes for the purpose of aiding the Legislature in making a more compact and consistent body of law, *L.* 1950, *c.* 171, *p.* 369.

In this connection it is to be noted that by its resolution of February 25, 1953, Jersey City sought an order directing a summary investigation under *R. S.* 40:6–1:

> "Whereas the Board of Commissioners of the City of Jersey City, while in no manner desiring to avoid or prevent any legally justifiable investigation of the affairs of the City since May 17, 1949, are at the same time desirous that no court of the State of New Jersey should permit itself to be imposed upon by applications made in bad faith and without substantiation and for cynical partisan purposes under *R. S.* 40:6–1, and the said Board of Commissioners being desirous also, as aforesaid, that if there is to be an investigation of the City's affairs pursuant to *R. S.* 40:6–1, such investigation should of necessity be an integrated investigation of the affairs of the City over the entire period continuously from the year 1917; and * * *
>
> Whereas *R. S.* 40:6–1 provides that a judge of the appropriate court 'may, in his discretion, make a summary investigation into the affairs of such * * * municipality,' 'if * * * the legislative body of such municipality, by resolution, shall request such justice to investigate the affairs of the municipality * * * making such request';
>
> Now therefore be it resolved, * * *
>
> The Board of Commissioners of the City of Jersey City, being 'the legislative body of such municipality,' within the meaning of *R. S.* 40:6–1, hereby requests that the Honorable Judge Haydn Proctor, or any other judge or justice of the State of New Jersey before whom this matter shall or may come, shall, in the event that a judicial investigation shall be ordered of the affairs of the City of Jersey City on the basis of the aforementioned application of Julia Tiene *et al.*, cause such investigation to cover the affairs of the City for the entire period beginning with the year 1917."

Having in effect counterclaimed under the statute, as it had a right to do, for an even more extensive investigation than the applicants asked for, it is clearly estopped to deny the applicants' right to a summary investigation.

2. Next the city asserts that the court below erred in refusing to make an inquiry into the extent of the actual knowledge of the applicants respecting the facts alleged in their affidavits as distinguished from hearsay. Under the statute if the applicants "have cause to believe" that there have been unlawful or corrupt expenditures of public moneys, the judge may "in his discretion" order an investigation. Necessarily, many of the charges set forth in the taxpayers'

affidavits are hearsay, for they ordinarily do not have direct access to the records of the municipality, but where, as here, they cite testimony before grand juries and criminal commissions as reported in newspapers, as well as testimony taken in court and affidavits submitted in connection with such court proceedings, the allegations may well move the court to act in the exercise of his sound discretion. Obviously in such situations much must be left to the judge's sound discretion. In *In re Wellhofer*, 137 *N. J. L.* 342, 344 (*Sup. Ct.* 1948), *supra*, Mr. Chief Justice Case held:

"True, the inquiry is not to be lightly or perfunctorily entered upon, and there should be enough in the proofs to support the exercise of judicial discretion; but on the other hand it would throw the whole proceeding out of joint to require, at the threshold, that character of proof which is really the final objective to be deduced by the investigation. Theoretically what the applicants present is their belief that there has been lawless or corrupt expenditure of public funds, with sufficient authentication to weight the discretion of a justice of the Supreme Court toward making a summary investigation. The greater the need for such an undertaking, the greater the impulse for defensive dilatorv tactics, a truism too obvious for further detail."

The purpose of the statute was discussed in *North Bergen v. Gough*, 107 *N. J. L.* 424, 427 (*Sup. Ct.* 1931):

"The Legislature clearly meant this statute to be the channel whereby a minority, having reason to suspect the unlawful or corrupt use of the moneys of the municipality, may present their apprehensions to a justice of the Supreme Court, whereupon that high judicial officer shall make an investigation, and thereupon, if he be satisfied of the propriety of so doing, may at his discretion appoint others, experts, to prosecute the investigation. There was thus set up a *quasi* judicial method, not of charging an offence or causing trial thereof, but of ascertaining and, if so the judicial officer should determine, of publishing the facts of a very particular and vital phase of governmental activity, namely, the handling of public funds. In any event, the investigation may be regarded as an effort to ascertain the truth of a charge involving the swindling of the government out of its money, and this, as was indicated in *Ex parte Hague*, [123 *N. J. Eq.* 475] 150 *Atl. Rep.* 322, is a proper subject of inquiry."

■■ Once the court has determined that an affidavit has been made by 25 freeholders in the municipality who have

paid taxes on real estate within one year and that they have cause to believe that the moneys of the municipality are being, or have been, unlawfully or corruptly expended, the decision as to whether or not there should be an investigation, as we have seen, rests in the sound discretion of the court. Manifestly it would be unwise for the court to permit any further preliminary inquiries beyond the hearing the municipality is accorded on the return of the order to show cause. As was said in *In re Wellhofer, supra*:

"The greater the need for such an undertaking, the greater the impulse for defensive dilatory tactics, a truism too obvious for further detail."

On the return of the order to show cause the municipality may, of course, submit affidavits in denial or in explanation of the applicants' charges, but it cannot be permitted to set up road blocks against an investigation which the court determines to be necessary in the public interest.

Not only was the city afforded an ample opportunity to file complete affidavits in defense, but it should be borne in mind that the investigation is at all times within the control of the assignment judge who is not without power to discontinue the probe or to take steps to have the applicants punished, if it should at any time appear that he has been imposed upon. If there should be any abuse of discretion in ordering the investigation, the city may appeal therefrom.

3. The city complains that the trial judge erred in failing to make an inquiry into the charges made by the city of fraud and connivance in the recruiting for political purposes of the taxpayer applicants. There is, of course, no merit to this contention. The trial court was concerned only with the subject matter of the allegations in the application, not with the motives of the applicants.

4. Next the city claims that the assignment judge erred in declining to make a preliminary inquiry into the manner of the execution of the affidavit by the 49 applicants, all of whom according to the application appeared before

the same notary public on Saturday, January 24, 1953. The city claims that if any one of the 49 applicants failed to appear on January 24, 1953 before the notary public to take the oath and subscribe the affidavit, the entire affidavit is null and void because the jurat is untrue. Clearly this is not so. The affidavit is ineffectual only as to those applicants who did not appear in person before the notary public and take the oath and subscribe the affidavit before her.

The city filed six affidavits, one of them by a handwriting expert, in an effort to attack the affidavit of seven of the taxpayers, and the applicants filed five answering affidavits, including one by the notary public whose name appears on the application as having taken the affidavits of the 49 taxpayers. The affidavits on behalf of the city, which at best attack the validity of the execution of the affidavits by seven signers, are replete with hearsay and conclusions. The affidavits of four of the taxpayers whose execution of the affidavit attached to the petition is under attack categorically and without reservation affirm the proper execution of the affidavit attached to the petition by them and refute in detail what is said concerning them in the city's affidavits. The affidavit of the notary public is particularly interesting. She describes how the taxpayers came to the office of their counsel, Mr. Murray Greiman, in two large groups, that Mr. Greiman read the application to each group, each reading taking almost two hours. After questions had been asked and answered, the taxpayers then signed the affidavit and swore to it before her and she thereupon executed the jurat. Thereafter in the company of Mr. Greiman she went to the homes of about ten people and took their affidavits in the same manner. Late on January 24, 1953 Mr. Greiman telephoned her and asked her to call at the home of Mr. and Mrs. George Gerold, who were his next door neighbors, and take their affidavits, they having signed the application in his presence, but that in the rush of the affair she forgot to do so. The affidavit of all of the other signers of the application, however, was taken in her presence by her either at Mr. Greiman's

office or at the home of the ten signers above referred to. Thus the city's attack is borne out at the most only as to three of the 49 signers, the two admittedly having failed to sign before the notary public and one the attack on whom remains unanswered. The unchallenged number of the taxpayer affiants is so great that clearly no good purpose would be served by a lengthy preliminary hearing as to the method by which each signed the application.

5. The city contends that the court should have made findings of fact under *R. R.* 4:53–1 (formerly *Rule* 3:52–1), both because he was acting as a statutory agent and because such findings are required in order to facilitate the taking of an appeal. *R. S.* 40:6–1 gives the judge jurisdiction only upon the submission of affidavits of 25 taxpayers, setting forth that they are freeholders who have paid taxes on real estate within one year and that they have cause to believe that moneys of the city have been unlawfully or corruptly expended. Admittedly such affidavits establishing jurisdiction were submitted and the court so found in his order of April 2, 1953 directing a summary investigation, and to that extent there are findings of fact here. Having found jurisdiction, the judge then had the power in his sound discretion to order an investigation, but the exercise of such discretion requires no further findings of fact in this kind of proceeding. The statute requires none, and the type of procedure does not lend itself to them. Nor is the city prejudiced thereby. Obviously the assignment judge's exercise of discretion must be based upon the affidavits submitted to him. The city was served with a copy of the affidavits, and it has direct access to all of its own records, and thus greater knowledge of the facts than anyone else.

In this same vein it claims that when proceeding in a summary manner, as here, the court in compliance with *R. R.* 4:85–1 (formerly *Rule* 3:79–1) must hold hearings so that evidence can be presented upon which these ultimate findings will be based. It is difficult to see how the taking of testimony would throw any light on the crucial issue of whether the applicants have cause to believe the moneys of

the city have been or are being unlawfully or corruptly expended. *R. R.* 4:85–1 is clearly inapplicable to proceedings of this nature.

6. The city further contends that the applicants should have been required to furnish a bond sufficient to cover the expenses of the investigation, and not merely one in the amount of $10,000.

*R. S.* 40:6–2 provides:

"The justice may, if he deems it advisable, require the applicants to furnish a bond to be filed with the county clerk in such sum as he may deem necessary for the payment of the costs and expenditures of the investigation."

In *In re Wellhofer*, 137 *N. J. L.* 165, 175 (*Sup. Ct.* 1948), where an investigation into the municipal affairs of Atlantic City was ordered, Mr. Justice Eastwood stated:

"It is discretionary with the Justice, if he deems it advisable, to require the applicants to furnish a bond to be filed with the county clerk in such sum as he may deem necessary for the payment of costs and expenditures of the investigation. This provision is obviously so worded that the bond shall not be in an amount so large that its exaction would prohibit the applicants from furnishing it. I am sure it will not be disputed that the applicants are taxpayers of moderate means and it is reasonable to assume that it would be financially impossible for them to furnish a bond in a substantial amount. To insist upon their furnishing a large bond would obviously result in defeating the investigation in question and the useful purposes of the statute would be nullified. In my opinion the statute did not contemplate the insistment that a large bond be required in such a situation. The applicants will, therefore, be required to furnish a bond in the sum of $5,000 to secure the payment of costs and expenditures of the investigation."

In denying *certiorari, In re Wellhofer*, 137 *N. J. L.* 342, Mr. Chief Justice Case, after quoting the statute, said at *page* 346:

"Thus, it was optional with the justice whether any bond should be required and what the amount of the bond, if required, should be."

In its brief the city quotes at page 61 from *In re Newark*, 118 *N. J. L.* 533, 535 (*Sup. Ct.* 1937):

"The costs incurred in such investigation shall be taxed by the justice, and paid, upon his order, by the officers whose expenditures are investigated, if the facts in such affidavit be substantially proved, and otherwise by the freeholders making such affidavit."

asserting that it is the judicial construction of *R. S.* 40:6–2 above quoted. Instead of being a construction of the bond provision of our statute, however, it is a direct quotation, as even a cursory reading of that case would have shown, from an 1892 New York statute as set forth—and the opinion in *In re Newark* so states—from in *Matter of Taxpayers of Plattsburg,* 157 *N. Y.* 78, at *pages* 81–82, 51 *N. E.* 512.

 The statute here under review or its precursors have been in force for 74 years. These statutes have been consistently construed by the courts as remedial in their nature. They have served the useful purpose of enabling the public to ascertain the true state of municipal expenditures. The necessity for such a remedial statute increases with the complexity of municipal functions and the volume of public expenditures. It overcomes in considerable measure whatever shortcomings in practical effect there may be in the ordinary remedies of the civil law or by grand jury investigation and indictment by reason of the complexity of municipal affairs. An investigation under the statute will disclose whatever information is necessary to end public criticism, if the criticism set forth in the application of the taxpayers is unjust. On the other hand, if the criticism is justified, it will lay the basis for other proceedings, civil and criminal, for the protection of the municipality.

Finding no merit in any of the grounds urged by the city the order appealed from is affirmed.

WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.