IN THE MATTER OF THE SWORN APPLICATION OF JOHN G. RIES AND OTHER FREEHOLDERS OF DELAWARE TOWNSHIP, ETC.

Argued November 14, 1955—Decided December 12, 1955.

142

Mr. *Joseph Tomaselli* argued the cause for the appellants.

Mr. *Warren C. Douglas* argued the cause for the respondent (Mr. *John E. Yeomans,* attorney for the respondent).

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal from the dismissal by the Law Division of the Superior Court of a petition for a summary investigation into the affairs of Delaware Township under *N. J. S. A.* 40:6–1.

The pertinent provision of the statutes according to which the petition was presented (*N. J. S. A.* 40:6–1) provides that:

"A judge of the Superior Court may, in his discretion, make a summary investigation into the affairs of any county or municipality, whenever

(a) A petition for such investigation shall be presented to him signed by twenty-five freeholders who have paid taxes on real estate within one year, of the county or municipality, as the case may be, and such petition sworn to and subscribed by them sets forth that they have cause to believe that the moneys of such municipality or county are being, or have been, unlawfully or corruptly expended; * * *"

On April 15, 1955 27 freeholders of the Township of Delaware presented an application seeking a summary investigation into the affairs of Delaware Township primarily in connection with the construction and operation of a sewage treatment plant. The petition alleged

1. That the township was paying excessive fees to its engineer; that it was not receiving full measure of services of such fees; that township contracts require a fee of 5% to be paid by the contractor to the township engineer which is in addition to the 7% paid by the township; and that the position thus assumed by the township engineer is improper, unethical and illegal.

2. That the sewage treatment plant location was changed after the bids were accepted.

3. That the plant was not completed in April 1955 and that the township engineer failed to invoke the penalty clause against the contractor for failure to complete the plant by August 31, 1954.

4. That competitive bidding on the contract was thwarted when the township engineer, prior to bidding, ordered certain equipment and required bidders to allow a total of $24,950 for this equipment in their bids.

5. That provision for at least 680 feet of sewer lines was contained in the contract which were not contained in the enabling ordinance and therefore illegal.

6. That the sewage treatment plant was of antique design, highly overpriced and inefficient in operation and of faulty construction which will require excessive maintenance and power costs.

7. That the plant as constructed was a health menace and that the township officials were so notified by the State Department of Health.

Attached to the petition were 21 exhibits consisting in part of affidavits setting forth the information learned on inquiries made by some of the petitioners in attempting to learn the facts; photographs showing cracks in the walls of the settlement beds and reports and letters from the State Department of Health criticizing the maintenance and operation of the existing sewer plants in the township and pointing to the inadvisability of adding another of small capacity.

Prior to the granting of the order directing the township to show cause why the requested investigation should not be had, the judge directed each of the petitioners to appear personally before him and be examined in open court.

██ This was error as was the taking of testimony in the circumstances of this case of five witnesses in open court on behalf of the township in opposition to the petition and of two witnesses on behalf of the petitioners in support thereof, which we shall comment on later in this opinion. The court by so doing turned what was intended under *N. J. S. A.*

40:6–1 to be a "summary investigation" into a plenary hearing. The sole requirement of the statute is that 25 freeholders, who paid taxes on real estate within one year, subscribe and swear to a petition which sets forth that they have cause to believe that financial affairs of their municipality are being unlawfully or corruptly mismanaged. Once the court has determined the existence of these jurisdictional factors the discretion of the court is to be exercised. Any preliminary trial of the alleged charges with its incidents of cross-examination and rebuttal prior to the decision of the court to make a summary investigation is premature and has the tendency to devitalize an otherwise effective mechanism. The instant case furnishes a good example. As we said in *In re Tiene*, 13 *N. J.* 478, 490 (1953), "on the return of the order to show cause the municipality may, of course, submit affidavits in denial or in explanation of the applicant's charges." The inquiry, if any, should be limited to the determination of whether or not the court is being imposed upon by the petitioners, *Park Ridge v. Reynolds*, 74 *N. J. L.* 449 (*E. & A.* 1906). Nothing more is required to weigh the discretion of the trial judge in favor of the investigation than proof of the *prima facie* existence of reasonable "cause to believe that the moneys of such municipality or county are being, or have been, unlawfully or corruptly expended."

The comments made by the trial judge at the beginning of his preliminary inquiry give a clear indication of his purpose in following such procedure. He announced to the petitioners:

"THE COURT: Gentlemen, I have before me an application by a number of freeholders of Delaware Township for a summary investigation, and, having fortunately, or unfortunately, been through several of these before, I think I am somewhat experienced in them.

Frequently in the past, I have had persons, after the investigation has been started and taken up a lot of time, the signers of the petition come to me and say, 'Well, we didn't understand it, and we want to withdraw from it.' and I have just not permitted that.

Once, if the ball starts rolling in a thing like this, it is like a snowball; it accumulates, and you never know where it is going to stop.

It is up to me to direct the experts who do the actual investigating, but, on the other hand, I cannot stop them. They will start off on one lead, and they will keep going, and, since they are the ones most familiar with it, it would be in very poor taste for me to stop it.

Now, a thing like this—I have read this petition carefully, and the exhibits attached to it—if it is allowed, we get the investigators going, it is going to require at least two lawyers, I don't know how many engineers, an accountant or an accounting firm, and the stenographic services. I would put the minimum expense—and yet, this does not and should not have anything to do with it—but the minimum expense I would put at $10,000, and I would hope the maximum would be $100,000.

That, of course, is paid by the taxpayers of the municipality, if it is justified.

If the investigation is not justified, then it is paid by you gentlemen.

You will put up a bond, to take care of the expense, in the event the investigation does not justify the municipality paying for it.

Of course, by the municipality is meant all of the taxpayers in the municipality.

Now, I am going to have every signer of this petition sworn, and make certain that he appreciates, knows what he is doing and agrees to it, and is going to put up a bond sufficient to take care of this, in the event that it is not justified * * *"

All but three of the petitioners appeared and were examined. One of the three who did not appear, later withdrew and removed her name from the petition and by letter to the judge stated that in her opinion the action was purely political.

The testimony of the first witness examined by the court is characteristic of the court's approach to these petitioners:

"JOHN G. RIES, sworn.

THE COURT: Mr. Ries, you have signed this petition, and I have just outlined to you what it entails.

Now, is that your signature on that petition?

THE WITNESS: That is.

THE COURT: And you thoroughly understand, do you—

THE WITNESS: I do.

THE COURT: (continuing)—what this is?

THE WITNESS: That's right.

THE COURT: And you are willing to put up a substantial bond, in case the investigation is not warranted, to go through with it?

THE WITNESS: May I ask this question?

THE COURT: Certainly.

THE WITNESS: So, suppose there is nothing of consequence found? We are talking about how much, because, after all, I don't have unlimited funds.

THE COURT: Well, as I outlined, and I will try to talk loud enough so that you gentlemen can all hear me, because it is common to all of you, once these experts get started, they have to go. Now, I cannot stop them, unless the investigation were called off, or something of that sort, but I have never had one called off, and I am not sure that it could be, once it starts. But, the investigation must have been justified. Otherwise, the signers of the petition are going to pay the expense of it, regardless of what it amounts to, and the amount is something that, as I say, I cannot control.

THE WITNESS: Well, what I am getting at is, you fix a maximum bond, is that right?

THE COURT: I fix a bond for you gentlemen, yes.

THE WITNESS: That's right, so that we don't get involved with an unlimited—we know where we are going, in other words.

THE COURT: Yes, you know, because, if I found out from the investigation we weren't getting anywhere, I think I would stop it pretty shortly.

THE WITNESS: Well, I, for one—

THE COURT: But the bond is going to be conditioned upon each or all of you paying the penalty, in the event the application is not justified.

Now, with that, are you content your name remain on here, and you will not ask to withdraw, and you understand that, even if you should, I will deny it?

THE WITNESS: Right.

THE COURT: I will not permit you to withdraw.

THE WITNESS: Yes.

THE COURT: Very good.

\*        \*        \*        \*        \*        \*        \*        \*

THE COURT: Very well. They are now on the record. That is all, Mr. Ries, unless you have anything that you wish to say, or any question you wish to ask.

THE WITNESS: Well, I am curious—of course, I am not an attorney. I am just curious as to how much this bond might be. Is it going to be a $5,000 limit for all, or is it individually $5,000?

THE COURT: I am very frank to state I have not made up my mind about that.

The statute calls for a bond, and I will read it to you.

'The Judge may, if he deems it advisable, require the applicants to furnish a bond to be filed with the County Clerk in such sum as he may deem necessary for the payment of the costs and expenditures of the investigation.'

That is what the statute reads with regard to the bond.

Now, if, as I outlined to you, if the investigation warrants it, that bond at the termination of the investigation is cancelled, and the municipality pays the expenses. If it does not, then the bond takes effect."

148

In the course of this preliminary questioning by the court another witness responded as follows:

"THE COURT: Do you know of any crimes that have been committed out there? I know you are not a lawyer, but anything that you think is a crime that has been committed out there by the rulers of the municipality?

THE WITNESS: I would be in a poor position to judge whether they are a crime or not. I feel certain that there are possible irregularities in the conduct of the affairs. I also feel that, because of the rumors and the tales that have turned up in the Township concerning these irregularities, that it is only fair to the people involved that an investigation with the power of subpoena be used to determine where these people stand. I have no intention, no desire to see anyone wrongdone, but, as you well appreciate, I can only go a certain distance on my own on investigation, thereafter I run into a blank wall, and this appears to me to be the only possible solution for those of us who have seen these things with their own eyes, or have heard them, to find out where the truth lies.

THE COURT: Have you considered, or has it been suggested to you to go before the Grand Jury, each and every one of you?

THE WITNESS: Yes, sir, that was suggested at Town Hall, but I think, as you well appreciate, in the Grand Jury investigations, that, unless we can take affidavits in, signed by various people, submitted voluntarily, that our hands are stymied, and if we go into the Grand Jury without those affidavits, the people that we suggest to be called may or may not be called to testify.

\*     \*     \*     \*     \*     \*     \*

THE COURT: And you are perfectly willing to put up a bond that may be required, in the event that this investigation is not justified?

THE WITNESS: I am not a rich man, but I will make every effort to do my share of it.

THE COURT: Well, the bond would be, as I told Mr. Ries, it will be a substantial bond, but just how much, at this time I do not know.

THE WITNESS: I will make every effort to do my part on it.

THE COURT: All right \*   \*   \*"

Another stated that he believed that what was involved was inefficient and incompetent administration; that he didn't know whether these charges were true or not but felt the situation was serious enough to warrant some proper authority to dispel the clouds of doubt and rumor that had gathered about the entire situation.

The bond question having been made point of by the judge, the petitioners became concerned with their position and of the possibility of being held responsible for the expenses of the proceedings. Their attorney inquired:

"MR. TOMASELLI: I have one question that I would like to direct, if your Honor please.

According to the questioning of your Honor, you are going along on the basis that whatever bond, if such is required, will have to be signed by each one of the petitioners.

Now, that also is not in accord with my understanding of the law in this State.

THE COURT: Well, that is what I am going to do, Mr. Tomaselli.

MR. TOMASELLI: And that is what you are now advising.

THE COURT: So we can skip that.

MR. TOMASELLI: In other words, you are now notifying the petitioners that that is your intention, if such a case arises.

THE COURT: I will require a bond, yes."

Another witness expressing his agreement to the petition elicited the following discourse:

"THE WITNESS: Yes, sir, I agree that there are so many conflicting stories in the Township that I think the thing should be cleared up. I mean, we hear one side of the story and another side of the story, and where is the truth? That is my only interest in the case.

THE COURT: Suppose I were to turn this over to the Grand Jury, with a special charge, directing them to go into it thoroughly and make their report?

I charged them yesterday specifically, and I tried to lay emphasis upon just such a thing as this, where they might make an investigation.

They, of course, have the power to subpoena anybody. They have the power to have engineers, to have accountants. They can make any kind of an investigation they want, and then they can return what we term either an indictment, where the guilty persons, or the people who have been indicted have to stand trial before a petit jury, or, if they find things that are irregular, and yet no criminal action is involved, they file what we term a presentment, which is a matter of criticism.

Now, how would you feel if I were to specially charge the Grand Jury to make a thorough investigation of this?

THE WITNESS: Well, sir, I think the Grand Jury investigation would be a good action, from what you say, I am not familiar with the law, or what is the best procedure, I mean.

THE COURT: Well, I understand that the other Grand Jury— that a few witnesses, three or four witnesses, were called before the other Grand Jury. I do not believe everything that the newspapers print, but I did see where there had been some criticism of the other Grand Jury by somebody that didn't look too good in the newspapers. Then, after that, I saw there, too, and I learned that certain individuals had been before the Grand Jury, and that that Grand Jury had given a clear bill of health. Again, I am quoting from the newspapers. That I always take with a grain of salt. I see too many things in my own court where the reporters make mistakes. They are honest mistakes, but it is because they do not know the legal technicalities. Frequently, they do make errors.

Now, I can charge a Grand Jury, and ask them to make a special investigation of any matter that comes to my attention, and it is not unusual at all that that be done.

THE WITNESS: Well, sir, I read about the Grand Jury investigation last week, and, here again, I don't know a thing about Grand Jury, or any action of law. This is my second trip to the courtroom. I came here last week by mistake. But, it seems to me that more than three witnesses will be necessary in a case like this.

THE COURT: I would direct or request the Grand Jury to have each and every one of you appear before it. That would be in my charge to them, that each and every one of you appear, and that the investigation go on from there.

THE WITNESS: Well, sir, may I say I am not taking exception to the Grand Jury's action, but, what little I know about the questions which I have read and agreed to sign to, there are just too many questions for only a small group. It is going to take a lot of questions and answers to clear the skies.

THE COURT: Well, what would you think of the Grand Jury doing it, on a special charge?

THE WITNESS: So long as the matter is investigated, it is immaterial to me as to whether this type investigation is made or the Grand Jury makes it."

At the conclusion of the preliminary hearing, the order to show cause issued. On the return day the township presented the testimony of five witnesses in open court in opposition to the petition. The township engineer was the principal witness. He testified that he prepared the plans for the sewage treatment plant and that in the contract for the plant there was included a clause for 5% to be paid to him by the contractor for setting lines, stakes and grades, and that he considered it a reasonable charge. In response to questions by the court as to the propriety of working for

both sides, he indicated that it was probably not proper, that he very frankly preferred not to do it, but that the contract provided for the setting of lines, stakes and grades, which the contractors usually required the municipal engineer to do, and, therefore, a charge had to be made for it. He indicated that he realized that doubt could exist as to whether it was mandatory that a contractor hire him to do that work, and for that reason he sent out a letter three days prior to receiving the bids, that if the contractor chose to do that work there would be no charge therefor. He further indicated that in this particular case the contractors did their own work and he did not collect the 5% additional fee. He admitted that for the sake of expediency he ordered certain equipment but that it was stated in the specifications that the contractor was to allow $23,000 in his bid for such equipment, and that the contract provided that a substitute could be made for it if the contractor could obtain equipment "equal in all ways to that which has been placed on order by the engineer." He admitted that sewage lines were contracted for by the township which were not included in the enabling ordinance and that this was due to his inadvertence in failing to include provision for them in the ordinance when it was written up. He stated that he personally bore the cost of this additional line. He testified that the plant location was not moved after the contracts were let; that he had not recommended that the penalty clause be invoked against the contractors because through his own error the completion date of August 31, 1954 was not changed when it should have been because of the delay resulting from the required validation of the enabling ordinance by submission to the voters and further, because there was delay in getting certain pipe fittings which were unobtainable. He also admitted that there were faults or cracks in the settlement beds, but stated they in no way would affect the operation of the plant.

Another witness, a sanitary engineer employed by the Bureau of Public Health Engineering in the State Department of Health, testified that this activated sludge plant was

one of the most modern design and one of the newer methods in general use; that the activated sludge type plant is economical to maintain and operate; and that another type (Hayes-Griffith type), also approved by the State Department of Health, is not considered superior to the activated sludge plant, although the better treatment would be a combination of both, but this would entail additional expense. He testified that the township had suffered many difficulties in trying to maintain its sewerage facilities as the State Department of Health would like to have them do and as the township indicated it would like to do; that like many small municipalities they were handicapped for a long time because of financial difficulties and they had difficulty maintaining a licensed man to run their sewage treatment plants, and that they had only part-time licensed help who were working for some other municipality and spending only part of their time with Delaware Township; that this sort of thing was common in emergency situations, for a few months or sometimes a year or two, but is a very unsatisfactory arrangement and a very difficult thing for a municipality and the State Department of Health to live with. This witness further indicated that such a type of operation with part-time help was partly due to economy and partly due to their inability to get the right employees, and that it sometimes takes several years before a man is really qualified to do the job and get his license. He further indicated that the picture reflected by some of the complaints of the State Department of Health "as reflected in these exhibits which you have shown me, is substantially different * * * I can report that in general the observations were that housekeeping and general maintenance at the sewage treatment plant is what can be termed as nothing less than excellent." On cross-examination, the witness testified that he was making further investigations because of complaints received by his office made to the Attorney-General and the Governor.

Two witnesses presented on behalf of the petitioners, civil engineers employed by or owning companies who bid and lost out on the contracts for the sewage plant, in the main indi-

cated that they had from the information furnished them on the bidding determined that the plant was to be located in a swampy area and therefore included in their bids the costs of dewatering; that the plant as constructed was located in a different area where no pumping was necessary. One of these witnesses stated that although he received the letter from the township engineer to the effect that contractors would not be required to use his services, he felt that since the provision was in the contract a demand could be made to conform and "it wasn't safe to bid the job without it." The other witness indicated that there was no justification for ordering the required equipment during the year 1954.

At the conclusion of the hearing the assignment judge dismissed the petition stating:

"I have reached the conclusion now, after hearing the testimony, that it is what you might term a gripe of a few 'mal-contents' over the fact that they don't like the present rulers of the municipality, and they have different ideas as to what kind of a sewer plant. None of these petitioners, as I understand it, is a Sanitary Engineer, but they are posing themselves in a critical manner as such, particularly over the plan that was followed by the Engineer of this Township."

\*       \*       \*       \*       \*       \*       \*       \*

"I want any one of these petitioners who has more than a gripe, and as they testified, many of them when they were under oath, that this petition was based upon hearsay and upon rumor—we want something a lot more substantial than hearsay and rumor, before attempting to indict people, and before we put a municipality like Delaware Township to an expense that can run any where, I would say, as minimum of $10,000 to $100,000. Once an investigation like this gets under way, the expert is not very well in position to stop it. It is like a snowball that rolls and it gathers; and I, fortunately, have had experience of either three or four of these, so it is not new to me. One or two have been most beneficial; one or two have not been anything except an expense.

I made up my mind after the last one, that if any new one ever came up before me, I was going to see to it that it had some merit before I appointed an expert to go into this investigation. I am convinced here there is nothing that merits saddling this municipality with such a tremendous expense.

If any one of these petitioners knows of any crime that has been committed, it is his duty to go to the Prosecutor and to the Grand Jury. That is what we have a Grand Jury for. If there is anything that any of these petitioners feel warrants a Grand Jury's

action, it is their duty. The Grand Jury can investigate and will investigate, and the Grand Jury can, even though a crime has not been committed, it can criticize public officials, and it is its duty to have anything that is out of line. Now, that does not mean just bad judgment. None of us are infallible, and because somebody else does not agree with you or me, it does not mean that he is wrong; but it must be something substantial."

"\* \* \* if you have any gripe or just cause, I direct you to go to the Grand Jury.

I am, therefore, dismissing this petition."

Because this statutory remedy is one of the most practical means available to the citizens of the many municipalities of this State of exposing unlawful or corrupt acts of their governing bodies in dealing with finances, we deemed it important to have a further expression from this court on the administration of this law, *Mayor, etc., City of Hoboken v. O'Neill,* 74 *N. J. L.* 57 *(Sup. Ct.* 1906) ; *Park Ridge v. Reynolds,* 74 *N. J. L.* 449 *(E. & A.* 1906) ; *North Bergen Tp. v. Gough,* 107 *N. J. L.* 424 *(Sup. Ct.* 1931) ; *In re City of Newark,* 118 *N. J. L.* 533 *(Sup. Ct.* 1937) ; *Id.,* 119 *N. J. L.* 221 *(Sup. Ct.* 1937) ; *In re Wellhofer,* 137 *N. J. L.* 165 *(Sup. Ct.* 1948) ; *Id.,* 137 *N. J. L.* 342 *(Sup. Ct.* 1948) ; *Id.,* 16 *N. J. Super.* 60 *(Law Div.* 1951) ; *Id.,* 18 *N. J. Super.* 197 *(App. Div.* 1952) ; *Id.,* 10 *N. J.* 321 (1952) ; *Massett Building Co. v. Bennett,* 4 *N. J.* 53 (1950) ; *In re Tiene,* 13 *N. J.* 478 (1953) ; *Id.,* 17 *N. J.* 170 (1954) ; *Id.,* 19 *N. J.* 149 (1955), and accordingly certified the appeal on our own motion while pending in the Appellate Division of the Superior Court.

The basic questions presented on this appeal concern (1) the action of the trial judge in conducting a preliminary examination of the petitioners prior to the issuance of the order to show cause instead of proceeding in a summary way, and (2) whether in dismissing the petition he abused his judicial discretion.

█ The petitioners contend that the trial judge went beyond the bounds of propriety in his remarks to them concerning the amount of the bond he would require in the event he permitted the investigation and that he would

require each of the petitioners to sign the bond. This point taken is not without merit. Fortunately for these proceedings, the sincerity of the petitioners' belief and their strong desire to learn the truth behind the suspicious circumstances uncovered by their diligent but not too effective efforts to learn the facts kept them from being dissuaded by the court's suggestions that:

"The bond is going to be conditioned upon each or all of you paying the penalty, in the event the application is not justified * * *"

And

"* * * the minimum expense I would put at $10,000 and I would hope the maximum would be $100,000.

That, of course, is to be paid by the taxpayers of the municipality, if it is justified.

If the investigation is not justified, then it is paid by you gentlemen * * *"

None of the petitioners present, however, was frightened because of these remarks. Of the 27 original petitioners, 26 still remain and they are sufficient to satisfy the requirement of the statutes.

We think the trial judge went too far with his warnings. A fair reading of the record in this regard indicates that while attempting to impress the signers of the petition with the importance and seriousness of these proceedings, and that they ought not to be undertaken lightly or frivolously, he placed undue stress on the chances of financial loss to the petitioners. The procedure here followed partook of the nature of an inquisition and had the natural tendency to intimidate citizens and seriously hamper the good intended by these statutory proceedings. The trial court recognized that "This Act is one of the finest acts we can have to keep the municipal rulers straight," but his failure to truly comprehend that the bond provision is not punitive requires an appellate correction of his error.

In *In re Wellhofer*, 137 *N. J. L.* 165 (*Sup. Ct.* 1948) the bond for an investigation of Atlantic City involving 17

charges was set at $5,000. In so doing the court stated at *page* 175:

"It is discretionary with the Justice, if he deems it advisable, to require the applicants to furnish a bond to be filed with the County Clerk in such sum as he may deem necessary for the payment of costs and expenditures of the investigation. This provision is obviously so worded that the bond shall not be in an amount so large that its exaction would prohibit the applicants from furnishing it. I am sure it will not be disputed that the applicants are taxpayers of moderate means and it is reasonable to assume that it would be financially impossible for them to furnish a bond in a substantial amount. To insist upon their furnishing a large bond would obviously result in defeating the investigation in question and the useful purposes of the statute would be nullified. In my opinion the statute did not contemplate the insistment that a large bond be required in such a situation."

In an extensive summary investigation into the affairs of the City of Jersey City similarly involving, among many other things, the construction of a sewerage project costing $1,400,000, the bond fixed was in the sum of $10,000. This court held that there was no merit to a contention by the city that the petitioners should have been required to furnish a bond sufficient to cover the expenses of the investigation and not merely the nominal $10,000, *In re Tiene,* 13 *N. J.* 478, 493 (1953).

The evil sought to be avoided was very aptly recognized by one of the petitioners in the case at bar:

"THE WITNESS: Suppose an individual, no matter how much he wanted the investigation or felt that the investigation was justified, in order to clarify these things, still didn't have the financial means with which to contribute his part, which you say he is going to be compelled to do? Now, he would be forced by circumstances to say no, to try and withdraw from the investigation, just by the mere fact of circumstances, not whether he thought it was justified or not."

▮ The purpose of the bond is to insure that the persons who seek the summary investigation act in good faith and to avoid frivolous or ulterior imposition upon the courts. When the judge of the Superior Court is presented with an applica-

tion under this statute and determines to exercise his discretion in favor of the investigation sought, he should not vitiate the effectiveness of the statute by imposing conditions which would make it impossible for them even to be commenced. Such appears to be the impression derived from the record here.

Nor does there appear to be any basis for a requirement that all of the petitioners be signatories to the bond. In *In re Wellhofer*, 137 *N. J. L.* 342, 347 (*Sup. Ct.* 1948), Chief Justice Case stated:

"\* \* \* the applicants presented the present bond which carries two of the applicants as principals and a surety company authorized to do business in this state as surety. The security of the bond is not questioned. The argument that all of the applicants must be signatories on the bond lacks substance."

It is next contended that the sworn facts set forth in the petition were more than sufficient to establish the jurisdictional requirement that the petitioners have cause to believe that the moneys of the municipality are being unlawfully or corruptly expended and therefore the trial judge abused his discretion in dismissing the application for the summary investigation; that he misconstrued the very purpose of the statute in "directing" the petitioners to go to the grand jury; and that he improperly attributed political motives to the petitioners' action and overlooked the subject matter of the allegations of the petition and the proof presented.

█ The application provided for by the statute is addressed to the sound discretion of the judge of the Superior Court to whom it is presented, *N. J. S. A.* 40:6–1; *In re Tiene*, 13 *N. J.* 478, 489. But it must be remembered that the statute merely requires that the applicants show "cause to believe" that there is unlawful or corrupt conduct and that many times in these matters the belief of the petitioners is necessarily based on hearsay and suspicion and there is little else to go on. Ordinarily the petitioners do not have direct access to the records of the municipality, and in these cases many times all manner of difficulty is encountered in the initial

attempt to get at the truth, *In re Tiene, supra,* 137 *N. J. L.,* at *page* 489. The possibility and probability of being able to obtain better evidence, short of the investigation sought, should also be considered as a factor in determining the sufficiency of a petition in these proceedings. The proof required at the outset should in no way be of that character of proof which is really the final object of the investigation itself. "Theoretically what the applicants present is their belief that there has been lawless or corrupt expenditure of public funds, with sufficient authentication to weight the discretion" of a judge of the Superior Court toward making the investigation, *In re Wellhofer,* 137 *N. J. L.* 342, 344 (*Sup. Ct.* 1948). The evidence upon which the belief of the petitioners is based should be such as would reasonably tend to indicate serious misconduct in municipal affairs. If this is not sufficient basis, then this investigative procedure will be seriously restricted and the benefits of the statute lost to the public. As was said in the *Wellhofer* case and repeated in the *Tiene* case, "The greater the need for such an undertaking, the greater the impulse for defensive dilatory tactics, a truism too obvious for further detail," and the greater the impulse to prevent the inquiry.

There was sufficient *prima facie* showing here of what we consider a serious conflict of interest in the representation of a municipality by a professional engineer, notwithstanding the attempt to neutralize by the testimony of the engineer the written requirements of the contract. There was a sufficient *prima facie* showing of an attempt to circumvent and thwart the requirements of public bidding with respect to the items of machinery of the value of approximately $23,000, and this notwithstanding the claim that it was done without fraud and for the benefit of expeditious completion of the disposal plant. There was sufficient *prima facie* showing of an attempt to have included in the work contracted for services and materials not validly permitted, and this notwithstanding the explanation that the township engineer himself bore the financial burden for his error. We are in doubt, in the absence of a summary investigation, as to whether the

other items alleged in the petition can be satisfactorily explained and put to rest by the testimony permitted by the township on the return of the order to show cause.

It should be borne in mind that the investigation is at all times within the control of the assignment judge who is not without power to discontinue it or to take whatever steps he deems necessary as events develop, even to the punishment of the applicants if that be called for by the facts and circumstances, *In re Tiene*, 13 *N. J.* 478, 490; *Mayor, etc., City of Hoboken v. O'Neill*, 74 *N. J. L.* 57, 60 (*Sup. Ct.* 1906). The summary investigation statute is but one of the several procedural methods that exist in our law to review the acts of a governmental body or a public official and to expose violators of the public trust. It has long been recognized as the simplest and most effective procedure available to the citizens entitled to know the true conditions surrounding finances of their municipality. It is free from the complications of criminal procedure, the disadvantages of a special charge to the grand jury or a presentment, and the individual expenses incident to a proceeding in lieu of prerogative writ.

The very nature of the proceeding is indicative of an open investigation where there is doubt about municipal expenditures and reasonable cause to believe that public officials have not lived up to the requirements of the law. The existence of crime is not a prerequisite or in any way an essential part of the preliminary requirements for the institution of this type of probe. Where there is reasonable cause to believe something is amiss, the public is entitled to know the true facts to satisfy their doubts and either allay further criticism or enable the proper authorities to take appropriate proceedings for the protection of the municipality. As was said in *In re Tiene*, 13 *N. J.* 478, 494:

"The statute here under review or its precursors have been in force for 74 years. These statutes have been consistently construed by the courts as remedial in their nature. They have served the useful purpose of enabling the public to ascertain the true state of municipal expenditures. The necessity for such a remedial statute

increases with the complexity of municipal functions and the volume of public expenditures. It overcomes in considerable measure whatever shortcomings in practical effect there may be in the ordinary remedies of the civil law or by grand jury investigation and indictment by reason of the complexity of municipal affairs. An investigation under the statute will disclose whatever information is necessary to end public criticism, if the criticism set forth in the application of the taxpayers is unjust. On the other hand, if the criticism is justified, it will lay the basis for other proceedings, civil and criminal, for the protection of the municipality."

We conclude that the petition should not have been dismissed. The judgment of dismissal is therefore set aside and the matter remanded for further proceedings consistent with the statute, the applicable decisions, and this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, JACOBS and BRENNAN—4.

*For affirmance*—Justices OLIPHANT, WACHENFELD and BURLING—3.