IN THE MATTER OF THE SWORN APPLICATION OF JULIA TIENE AND OTHER FREEHOLDERS OF THE CITY OF JERSEY CITY IN THE COUNTY OF HUDSON FOR A SUMMARY INVESTIGATION INTO THE MUNICIPAL EXPENDITURES OF THAT CITY.

HARRY J. THOUROT AND PETER LaMORT, WITNESSES-MOVANTS-APPELLANTS, AND SAMUEL A. LARNER, EXPERT, RESPONDENT.

Argued June 6, 1955—Decided June 27, 1955.

See also 33 *N. J. Super.* 429, 110 *A. 2d* 567.

150

*Mr. Isadore Glauberman* argued the cause for the appellant Harry J. Thourot.

Mr. *Victor S. Kilkenny* argued the cause for the appellant Peter LaMort.

Mr. *Joseph M. Nolan* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The problem before us arises out of a proceeding by 49 freeholders of Jersey City for a summary investigation into the financial affairs of Jersey City pursuant to *R. S.* 40:6-1, the propriety of which was upheld by this court in *Tiene v. Jersey City*, 13 *N. J.* 478 (1953). Judge Haydn Proctor is the supervising judge of the statutory investigation and the respondent, Samuel A. Larner, is the expert appointed to prosecute the investigation. The appellants, Harry J. Thourot and Peter LaMort, are witnesses subpoenaed by this expert.

The appellants are partners in an engineering firm bearing their names. Thourot is also the mayor of Union City in Hudson County and the County Engineer of Hudson County. LaMort is also in charge of the engineering department of the City of Union City.

Clyde Potts Associates, a New York firm of engineering consultants, had received two contracts in connection with the construction of a sewerage project and the reconstruction of a water main—one from the Jersey City Sewerage Authority and another from the City of Jersey City. The sewerage contract provided for the ultimate payment to them of $1,-400,000. The water main contract provided for the payment of $47,500. In 1950, on two separate occasions, Thourot entered into agreements with Clyde Potts Associates whereby he was to receive in exchange for his engineering services a percentage of the engineering fees received by Potts from these two contracts. From the sewerage contract Thourot was to receive $410,000; at the time of the hearings herein he had actually received $171,500 from this source. From the water main job he actually received $12,370.54.

Late in 1953 the expert took up as a subject of his investigation the Jersey City-Potts-Thourot relationship. In November of that year Thourot and LaMort were served with

subpoenas *duces tecum* in this proceeding. Judge Proctor denied motions by these witnesses to quash the subpoenas and by order dated December 22, 1953 directed them to appear before the expert on the day designated therein

"to testify to all and singular of what they may severally know in the Sworn Application of Julia Tiene and the Other Freeholders of the City of Jersey City for a Summary Investigation into the Municipal Expenditures of Jersey City and not to depart from said hearing unless so directed by Samuel A. Larner, and it is further ordered that the said Peter LaMort and Harry Thourot bring with them and produce all bank statements, cancelled checks and check books for the years 1950, 1951, 1952 and 1953, any cash receipt and cash disbursements books, all payroll records, time records, time books, copies of income tax returns for the years 1950, 1951 and 1952, any general ledgers for those years, and copies of all work papers, drawings, plans, contracts involving work done on behalf of Clyde Potts Associates for the years of 1950, 1951, 1952 and 1953."

From this order these witnesses prosecuted an appeal to the Appellate Division of the Superior Court and applied for a stay of the commanded appearance. The Appellate Division denied the stay on January 15, 1954 but granted the appellants time to apply to this court for such stay. The subsequent motion for leave to appeal to this court from the order of January 15, 1954 was denied. The appellants then filed their brief on the appeal in the Appellate Division, but on a motion by the expert the appeal was dismissed by the Appellate Division on April 12, 1954.

After the dismissal of the motion for leave to appeal to this court the actual appearance by these witnesses before the expert was delayed because they were subpoenaed as witnesses in the case of *Schlossberg v. Jersey City Sewerage Authority,* a taxpayers' suit to set aside the entire sewerage contract award, considered by this court in 15 *N. J.* 360 (1954). Thereafter the expert sought to have these witnesses comply with the subpoenas previously served on them as well as the order of Judge Proctor of December 22, 1953. These witnesses, having now retained new counsel, made a motion before Judge Proctor for modification of his order "by limiting the scope thereof to matters relating to the municipal expenditures of the City of Jersey City" and vacating the

said order to the extent inconsistent with the "aforesaid limitation" and to restrain and enjoin

"Samuel A. Larner, Expert, his aides or any other person acting under his authority, from requiring or in any way attempting to require Harry J. Thourot and Peter LaMort to testify or produce records before Samuel A. Larner, Expert, in relation to any matter other than matters relating to the municipal expenditures of the City of Jersey City."

On the hearing of this motion Judge Proctor ruled that before deciding the motion the witnesses should be permitted to voluntarily appear before the expert, without being subjected to the hazards of criminal contempt, in the course of which appearance the exact boundaries of the issue with respect to relevancy of the evidence sought could be concretely determined, after which the court would make its decision. The witnesses did appear and testified, but refused to produce certain documents concerning their private financial records. The matter was then resubmitted and reheard before Judge Proctor on November 22 and 23, 1954. In an oral determination on the latter date Judge Proctor denied the witnesses' motion and on January 6, 1955 signed an order to that effect and declaring his previous order of December 22, 1953 to be in full force and effect without modification except as to the date on which appearance was directed.

The witnesses appealed to the Appellate Division of the Superior Court from this order and we have certified the appeal on our own motion.

On the hearings before the expert prior to the resubmission of the motion for modification Thourot himself revealed that the entire expense for the total operation of his office covering not only the two jobs mentioned but for *all* engineering jobs undertaken during the period involved (1950-1953) was approximately $15,000. Included in this amount were two cash expenditures totalling $7,000—$4,000 to Peter LaMort who when asked if he deposited this sum in his bank account testified:

"No I brought it home and put it in the box (strongbox),"

and $3,000 to an engineer named "Darling" who Thourot testified had worked for him. In this connection we find the following:

"Mr. Larner: He asked you to pay him in cash?
The Witness: Yes. Sure.
Mr. Larner: Wasn't it peculiar to you?
The Witness: No, sir. Not with that fellow, because—
Mr. Larner: Where did you get this cash?
The Witness: I had it.
Mr. Larner: You had it around the office?
The Witness: Oh, sure.
Mr. Larner: When was it?
The Witness: I think it was in 1951.
Mr. Larner: Approximately when? What month?
The Witness: I wouldn't know, Mr. Larner, I couldn't tell you exactly.
Mr. Larner: Did you get a receipt from him?
The Witness: No. I didn't.
Mr. Larner: Did you have any entry in any books or records of this payment?
The Witness: No. No."

On this first appearance of Thourot before the expert on November 22, 1954 he admitted that he had made a false affidavit in support of the motion to modify the order of December 22, 1953 when he said

"4. The only instance in which I have had any direct or indirect relationship to or concern with the municipal expenditures of the City of Jersey City during the years mentioned in the now pending orders directing me to appear and testify and produce records before Samuel A. Larner, Expert, has been in connection with a sub-contract which I have had with an engineering advisory contractor who has been under contract with The Jersey City Sewerage Authority in connection with the now pending Jersey City Sewerage Authority project. In April, 1950, I was retained by Clyde Potts, an engineer who was subsequently succeeded upon his death by the Clyde Potts Associates, to do some engineering work for him in connection with a contract which he had with The Jersey City Sewerage Authority. In the performance of my work I took no orders or directions from the Sewerage Authority or any of its officers or employees but my sole obligation was to the said Clyde Potts or the Clyde Potts Associates. In return for this work, I received no compensation either directly or indirectly from anyone but Clyde Potts or the Clyde Potts Associates."

On that same day he filed an amendment to the supporting affidavit wherein he stated:

"The said paragraph 4 of my said previous affidavit states that the sub-contract just mentioned is 'the only instance' in which I have had concern with the municipal expenditures of the City of Jersey City during the years mentioned in the aforementioned orders directing me to appear and produce records. The said statement that this was 'the only' such instance was an unintentional error. * * * The error to which I am referring consists in the fact that, during the period here pertinent, I have had one other sub-contract with the Clyde Potts firm involving work on a project for the City of Jersey City, but not related to the Sewerage Authority project. This other sub-contract was entered into October 18, 1950, it related to a contract for the designing and supervising of the construction of a 36 inch cast iron main located along the Belleville Turnpike from North Arlington to the Hackensack River for the City of Jersey City, and my compensation under the sub-contract was agreed to be 2% of the cost of the work, which, when eventually paid in full, amounted to $12,370.54."

A similar inconsistency exists with respect to the supporting affidavit of LaMort.

This much of the testimony and proceedings were before Judge Proctor at the time of his oral determination on November 23, 1954.

It is also interesting to note that this pattern of testimony and subsequent repudiation was repeated by Thourot when questioned in connection with the extent of his services for the fee he received under the water main contract. On November 22, 1954 he testified that his office had prepared and submitted to Clyde Potts Associates written surveys, records, maps and a written report pertaining to the job. Thereafter the expert personally visited Stanley Williams of Clyde Potts Associates and discovered that the testimony of Thourot was in part false. On November 30, 1954 Williams' testimony furnished the exact extent of Thourot's work and indicated that he had advised Thourot of the expert's visit. On that same day Thourot furnished another affidavit explaining his errors.

This chronology is adverted to because the appellants have complained that the testimony concerning the water main

contract, which was taken and introduced subsequent to November 23, 1954, is used by the expert in deriving his imputations against Thourot and, since it was not before Judge Proctor when he made his oral determination, it may not properly be considered in deciding the present appeal.

The appellants conveniently overlook the fact that all of the testimony and the evidence taken and received in this proceeding is part of this proceeding and may be considered by the expert, the supervising judge and us if necessary to the complete determination of the cause under review. (See *R. R.* 1:5–4). For this and the other reasons hereinafter stated, we deem this argument immaterial.

## I.

A preliminary issue is raised by the respondent-expert concerning the propriety of this appeal. It is contended that because the appellants have previously appealed from the same order, dated December 22, 1953, that an appeal should not now be permitted from the order which denies their application for a modification of that original order. Furthermore, he maintains that the order appealed from is not a final judgment within the meaning of *R. R.* 2:2–1 (this being an appeal to the Appellate Division); that it merely rejects an attack on a previously issued order which upheld the validity of the duly issued subpoenas and is not one from which a writ of error would have been permitted prior to our procedural reforms under the new Constitution.

It is clear that the appellants are attempting to use this motion to modify the original order of December 22, 1953 as a means of appeal therefrom. The records covered by the objections of the witnesses in the issue now before us were obviously included in the scope of that order. The motion required a reconsideration of the same grounds and was disposed of by a reissue of the same order. The dismissal of the appeal from the original order should have put an end to the controversy. *Turco Products, Inc., v. Hydrocarbon Chemicals*, 18 *N. J.* 130 (1954). The intervening case of

*Schlossberg v. Jersey City Sewerage Authority*, 15 *N. J.* 360, furnished no valid reason for granting these witnesses any relief from the mandate of the order. The relief there granted to them turned on the materiality and relevancy of the evidence sought as disclosed by the pleadings and pretrial order in a simple civil action. Mr. Justice Brennan writing for the Court said:

"\* \* \* To permit the trial itself to take on the aspects of a discovery proceeding is manifestly destructive of the aims of our new procedural framework. \* \* \* To allow impermissible discovery at the trial is frustrative of that objective, and was so to an aggravated degree in the instant case because directed to an issue outside any framed by the pleadings and pretrial order."

The adept inclusion in the motion below of a demand for injunctive relief has not been overlooked; nor has the appellants' argument that if the order appealed from is not a final judgment then it is nevertheless appealable under *R. R.* 2:2–3(*a*)(1). Were we to agree with this contention the appeal would notwithstanding be dismissable for being too late. *R. R.* 1:3–1(*c*). Furthermore, no leave to appeal was sought or given pursuant to *R. R.* 2:2–3(*b*); see *Milk Drivers, etc., Local* 680 *v. Shore Dairies, Inc.*, 8 *N. J.* 32 (1951); *United Cannery Maintenance, etc. v. Local* 80-*A*, 16 *N. J.* 264 (1954).

The order appealed from is not a final judgment. *Schlossberg v. Jersey City Sewerage Authority*, 15 *N. J.* 360, 364 (1954); *Sunbeam Corp. v. Windsor-Fifth Avenue, Inc.*, 14 *N. J.* 235, 238 (1953); *Mueller v. Seaboard Commercial Corp.*, 5 *N. J.* 28, 31 (1950); compare *Jaudel v. Schoelzke*, 95 *N. J. L.* 171, 174–176 (*E. & A.* 1920); *In re Pillo*. 11 *N. J.* 8, 14 (1952); *In re Vince*, 2 *N. J.* 443 (1949).

In the *Schlossberg* case one of the orders appealed from directed the production by a bank of photographic reproductions of checks of the same Thourot. The bank had first been served with a subpoena *duces tecum* to produce the records of the accounts of Thourot and LaMort. A motion by the witnesses to quash the subpoena was denied. An order was entered modifying the subpoena to limit it to checks over a certain amount because of the technical difficulties in re-

producing all the checks. Here, in disposing of the issue of appealability of the order Mr. Justice Brennan said:

"None of the orders appealed from is an interlocutory order appealable under *R. R.* 2:2–3; but, as matters of public importance are concerned, we concluded to consider the appeals upon the merits."

In the *Sunbeam* case we were concerned with an appeal from a discovery order requiring the defendants to produce and permit inspection of records and to answer specific questions. Mr. Justice Burling, in disposing of the appealability of the order, said:

"Under the circumstances of this case the order relating to discovery was not appealable under *Rule* 4:2–2(*a*) as amended, *supra.* [now *R. R.* 2:2–3(*a*) relating to interlocutory orders]. &ast; &ast; &ast; we have concluded to dispose of it upon the merits without regard to the fact that the appeal was not properly taken."

In the *Mueller* case the appeal was from an order denying a motion to quash a writ of attachment. Again, in disposing of the question of appealability Mr. Justice Burling said:

"It is observed, *in limine*, that the order complained of is not a final judgment and since there has been nothing brought to our attention indicating that it is such an interlocutory judgment from which an appeal will lie &ast; &ast; &ast; the appeal is inappropriate. &ast; &ast; &ast; However, &ast; &ast; &ast; we shall dispose of it on the merits."

The *Pillo* case involved an appeal by the State from orders upholding the refusal of witnesses to answer questions before a grand jury. In disposing of the issue of the appealability of the orders, Mr. Justice Brennan stated:

"If the orders stand they terminate the proceedings as to the questions at issue and so are final in quality, appealable &ast; &ast; &ast; as final judgments entered in a Trial Division. And see *In re Vince* (1949), 2 *N. J.* 443."

In the *Vince* case no issue of appealability was raised. We granted certification upon the petition of the State because the questions involved were of great public importance. There,

the trial court had discharged an order to show cause why a witness should not be ordered to answer certain questions propounded to her before a grand jury.

Why the distinction? Why are the orders appealed from in the first three cases held to be interlocutory and not appealable and the orders in the last two cited cases given a superior classification? The answer is to be found in *Jaudel v. Schoelzke, supra,* where the court in holding that an order quashing a writ of attachment was in effect an order in the nature of a final judgment said:

"If * * * an order was made by that tribunal [Supreme Court] *quashing* the writ, then, under the adjudged cases referred to, an appeal to this court would have been the proper procedure. If, on the other hand, the Supreme Court *refused to quash* the writ, then, of course, no appeal would lie, because of the lack of a final judgment, and, as we have seen, under the common law and under the Constitution, a writ of error can only be sued out after final judgment. * * *

* * * * * * * *

It is quite obvious that a case where there is a refusal to quash a writ of attachment must be controlled by an entirely different legal principle from that applicable to a case where the attachment was quashed, for the very plain reason that in the former case there is lacking a final judgment, or an order in the nature of a final judgment, which, under the common law and under the Constitution of this state, must exist before an appeal will lie. * * *" (Italics supplied)

In each of the instances where the direction to perform was not quashed but was sustained by order of the trial court, the issue of compliance was not finally disposed of and relief in some other form yet existed for the party or was available to the witness, or at least *status quo* in the action was maintained; but where the direction to perform was quashed or set aside by the court below, the issue of compliance therewith was definitely disposed of and no relief, except by appeal, existed. In that case the effect is similar to a dismissal of a complaint. The order under consideration must be controlled by these precedents and be denied any greater distinction.

██ Nor may an order be made a final judgment by merely labeling it as such. Whether it is a final determination depends on its nature rather than on any characterization of it.

██ Passing, as we are permitted to do, the procedural issue, we turn now, in the interests of justice, to a disposition of the matter on the merits, *Sunbeam Corp. v. Windsor-Fifth Avenue Corp.*, 14 *N. J.* 235 (1953); *Schlossberg v. Jersey City Sewerage Authority, supra; cf. United Cannery Maintenance, etc. v. Local 80-A, supra,* with the hope that such tactics will not be repeated and with the expectations that if they are they will be dealt with drastically.

## II.

From the prolix briefs of the appellants their contentions appear to be as follows: (1) that the authorized subject matter of the probe is limited to the financial affairs of Jersey City and any subpoena or order to testify or produce records which extends beyond that scope is invalid; (2) that they cannot be constitutionally compelled to produce private financial records without some formal charge or sworn proof on the investigative record giving rise to an indication that the records sought will disclose some impropriety relevant to the subject matter under inquiry; and (3) that the order violates the constitutional guarantees against unreasonable search and seizure and invasion of the right of privacy.

██ (1) We cannot agree with the appellants that the order appealed from is so broad as to be oppressive. Nor do we feel that such disposition is contrary to our statement in *State v. Cooper*, 2 *N. J.* 540, at *page* 556 (1949) where we said:

"* * * the subject of a subpoena *duces tecum* must be specified with reasonable certainty, and there must be a substantial showing that they contain evidence relevant and material to the issue. If the specification is so broad and indefinite as to be oppressive and in excess of the demandant's necessities, the subpoena is not sustainable. *Wigmore on Evidence* (3d ed.) *section* 2200."

This principle is embodied in our rules, *R. R.* 3:5–10(*c*); *R. R.* 4:46–2. What the appellants-witnesses fail to recognize is that in this statutory proceeding the expert is not restricted to any issues formulated by a set of pleadings or set forth in a pretrial order. The very purpose of his appointment is to investigate as widely and as thoroughly as possible into the transactions in which the financial affairs of the City of Jersey City were concerned. It is his duty to pursue his inquiry with the ultimate view of determining whether there was any wrongdoing or illegality in this regard limited only by the general scope of his appointment. While a subpoena issued solely with the hope that proceedings under it will turn up something material to the inquiry is to be condemned, the present proceedings do not come within that category. If there was reason to believe that a tracing of the moneys paid under these public contracts might ultimately lead to the disclosure that they comfortably reposed in the pockets of corrupt public officials and their supporters, then such tracing is a proper function within the scope of the inquiry. There was reason for such belief in the extraordinary discrepancy between the amount spent by Thourot and his partner in relation to the amounts received as fees, and the single bank account for both personal and business matters, as well as in the lack of evidence of service performed for the fee. The false affidavits and testimony given by the appellants created circumstances for further inquiry by the expert.

It is significant that our remarks in the *Schlossberg* case be noted at this point. In highlighting the distinction sought to be impressed this court said:

"While a prerogative writ proceeding is ordinarily concerned with the public business, it must be remembered that it nevertheless remains a civil action between named parties in which definite issues framed by the pleadings and pretrial order are tried and determined. *State v. Donovan* [129 *N. J. L.* 478], *supra.* The proceeding is in no sense a probe comparable to a grand jury inquiry, *In re Pillo, supra,* or an investigation into the conduct of municipal affairs, such as is now being made in Jersey City, *Tiene v. Jersey City,* 13 *N. J.* 478 (1953), where there are no pleadings or pretrial order to define

the issues of relevancy or materiality. 8 *Wigmore, supra, p.* 151. We note from official court records that Thourot is presently under subpoena in the Jersey City investigation to produce and testify concerning the checks here in question, among other matters."

■ (2) The appellants would have us hold that they ought not to be required to produce their personal papers in the absence from the record of a verified charge or formal accusation from which it could be inferred that such personal records are *prima facie* likely to have real relevancy. They would require a finding of "probable cause" as a prerequisite to such examination. Were we to do so all such investigations would come to a prompt conclusion quite detrimental to the public interest. The appellants' attack is basically one of relevancy and materiality and the lack of any reasonable grounds for suspicion of the commission of any wrongdoing. All of this has been established contrary to their contention. The appellants have dealt, by subcontract, with the municipality and with the benefits they have thus received they must assume the burden of a possible intrusion into their personal affairs for the good of the public. Their sworn denials in view of the suspicious circumstances that exist do not constitute a reasonable explanation.

In *In re City of Newark,* 118 *N. J. L.* 533, at *pages 536, 537 (Sup. Ct.* 1937), involving a similar investigation, the court pointed out that:

"What the statute is principally aimed at is corruption in public office; and this is not confined to improper and illegal expenditure, but is protean in the forms that it may take. In our decisions, it is uniformly treated as a beneficial act. The word 'affairs' is of broad significance, and I am unwilling to limit it to the jurisdictional condition. I regard the act as remedial, and entitled to liberal construction. * * * Nor was he justified in refusing to testify on the ground of irrelevancy or immateriality, and no claim of incrimination is made."

(3) It is interesting to note that the appellants have not raised any constitutional claim of self-incrimination as a barrier to the information that is sought by the expert. They prefer to resist with a claim of violation of their constitu-

tional right of privacy and guarantee against unreasonable search and seizure. Conceding the constitutional right of privacy, there is absolutely no basis for the claim that it has been or will be unconstitutionally violated by the order appealed from.

 The duty of the witnesses to give testimony in matters vital to the public interest is paramount to any personal right of privacy. In 8 *Wigmore on Evidence,* (*3d ed.* 1940), *Sections* 2192 and 2193, it is said:

"For more than three centuries it has not been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. (Cases cited and quoted) * * * From the point of view of the duty here predicated, it emphasizes the sacrifice which is due from every member of the community. * * * Or the sacrifice may be of his privacy, of the knowledge which he would preferably keep to himself because of the disagreeable consequences of disclosure. * * * When the course of justice requires the investigation of the truth, no man has any knowledge that is rightly private. All that society can fairly be expected to concede is that it will not exact this knowledge when necessity does not demand it, or when the benefit gained by exacting it would in general be less valuable than the disadvantage caused; * * *. From the point of view of society's right to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole,—from justice as an institution, and from law and order as indispensable elements of civilized life. * * * It follows, on the one hand, that all privileges of exemption from this duty are exceptional, and are therefore to be discountenanced. There must be good reason, plainly shown, for their existence. * * * On the other hand, if this duty exists for the individual to society, so also he may fairly demand that society, so far as the exaction of it is concerned, shall make the duty as little onerous as possible. * * * This testimonial duty to attend and disclose all that is needed for the ascertainment of truth applies to every form and material of evidence whatever. In particular it applies to such evidential material as exists in a person's hands in the form of documents."

There is no doubt that any witness who is subpoenaed to testify is affected with respect to his private rights. In the

balancing of private interest with the public interest, however, the weight is in favor of the public provided there is no abuse of power.

We cannot be impressed with the appellants' insistence on privacy when they commingle in a single bank account their personal affairs and their business dealings on public contracts.

The authorities cited by the appellants furnish no basis for changing the determination already arrived at. Nor are their arguments by any means novel or unusual. They have been presented by witnesses seeking to be relieved of their duties as citizens or their obligations as parties involved in transactions under investigation on most previous occasions where the statutory proceeding in use has been invoked. *Massett Bldg. Co. v. Bennett,* 4 *N. J.* 53 (1950) ; *In re City of Newark, supra; Township of North Bergen v. Gough,* 107 *N. J. L.* 424 (*Sup. Ct.* 1931) ; *Hoboken v. O'Neil,* 74 *N. J. L.* 57 (*Sup. Ct.* 1906) ; *Park Ridge v. Reynolds,* 74 *N. J. L.* 449 (*E. & A.* 1906). *Cf. In re Frey,* 26 *N. J. Misc.* 193 (*O. & T.* 1948).

An unlimited inquisition is never permissible and will not be countenanced. The investigative power must be used within the scope of the authority granted and as a means to an end and not an end in itself. We find the fundamental safeguards against constitutional violation here present. These witnesses are not unfortunate citizens being scourged by prying and unscrupulous inquisitors. They stand in the way of a complete determination of matters vital to the public and they must yield.

The order appealed from is accordingly affirmed.

HEHER, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and BRENNAN—5.

*For reversal*—None.