# IN THE MATTER OF SUBPOENA ISSUED TO L.Q., A JUVENILE.

Superior Court of New Jersey
Appellate Division

Argued June 6, 1988—Decided July 25, 1988.

Before Judges J.H. COLEMAN, O'BRIEN and HAVEY.

*Marshall L. Gates* argued the cause for appellant (*Catherine M. Langlois*, of counsel and on the brief).

*Jared L. McDavit* argued the cause for respondent (*Richard E. Honig*, Sussex County Prosecutor, attorney; *Jared L. McDavit* on the brief).

The opinion of the court was delivered by

O'BRIEN, J.A.D.

Pursuant to leave granted, L.Q., a 17-year-old female, and her parents appeal from the denial of their application to quash a subpoena issued to L.Q. to testify before the grand jury. We reverse and remand for further proceedings.

L.Q. was born on November 11, 1970. Between February and June 1986, on 25 or more occasions while a sophomore in high school,[1] 15-year-old L.Q. was the victim of several incidents of sexual contact by one of her male teachers.[2] It was not until the fall of 1986, after L.Q. ran away from home to talk to her brother who was attending college in New York City, that her parents learned of these incidents. When L.Q. returned home, her parents reported it to the high school administration. L.Q. was present and explained the nature and details of the incidents to the high school principal.[3] When the teacher

---

[1] In his report, Dr. Mischel said she was in the ninth grade.

[2] L.Q. denies there was ever any form of penetration.

[3] The high school principal had previously interviewed L.Q. about rumors concerning such incidents which L.Q. then denied.

was confronted with the report, he immediately resigned. Toward the end of September 1986, L.Q. gave a statement concerning the incidents to the police.

The prosecutor originally scheduled the matter for presentation to the grand jury on December 11, 1986 and subpoenaed L.Q., her mother and her brother. At the request of the attorney for L.Q. and her parents, a meeting was held with the prosecutor. At that meeting, the attorney produced a letter from the school psychologist to the school superintendent as to his counseling of L.Q. In that letter the psychologist said:

> I strongly feel that any judicial action to prosecute the teacher involved would have a potentially serious effect on [L.Q.]. It would reopen wounds, increase her public visibility, and decrease her coping skills. In short, I feel [L.Q.] could commit suicide.

The attorney requested that the prosecutor postpone presentation of the matter to the grand jury and L.Q.'s parents requested that the prosecution be abandoned. The prosecutor agreed to postpone the grand jury presentation.

In January 1987, L.Q.'s attorney forwarded to the prosecutor a letter dated January 10, 1987 from Dr. Ellis J. Mischel, who is medical director and psychiatric consultant for a counseling center where L.Q. and her parents had sought help. In his letter, Dr. Mischel stated:

> She is a sixteen year old high school student in emotional turmoil an [sic] is expressing suicidal thoughts.

He noted that L.Q. was being counseled by Rev. Anne Clarke, who is a pastoral counselor at the center, and recommended that no legal action be taken for the next two to three months.

In a report from Dr. Mischel dated April 7, 1987, sent to the prosecutor on April 22, he recommended "that L.Q. not be forced to appear in court but that she continue her therapy with Rev. Clarke." A memorandum dated March 16, 1987 from Rev. Clarke was enclosed in which she said:

> [L.Q.] suffered from depression and had serious suicidal thoughts last September.... She continues to struggle with depression and threatens suicide still as the only alternative if she has to go to court. I think the depth of her

depressive neurosis with suicidal intent must be taken seriously. She cannot tolerate the peer pressure that would be induced by a court appearance.

The prosecutor requested that L.Q. cooperate in obtaining a second evaluation of her emotional stability and her ability to appear before a grand jury without risk of harm to her mental or emotional health. At the State's expense she was examined by Frederick W. Bender, Ph.D., who submitted his psychological evaluation on July 15, 1987. In describing her mental status, Dr. Bender said in part:

Both insight and judgment appeared mildly impaired. Present suicidal or homicidal ideation was neither acknowledged nor denied by [L.Q.]. [L.Q.] reported suicidal ideation episodically occurring in September and October of 1986.

The doctor observed that L.Q.'s father saw nothing "wrong" with his daughter. "He believes that she is fine and believes she has put this event behind her." The doctor further observed:

Despite [L.Q.'s] minimization of her psychological stress and her need for therapy, she presents herself as having significant psychological concerns at this time. It is acknowledged that much of the presented psychological concerns appear to focus on the possibility of testifying in Court which is one event she believes to be unduly traumatic for her life. [L.Q.] seeks to 'undue' [sic] and 'redo' the past and to return to the relationships and structure and support previously experienced in her life.

Further, the doctor stated:

[L.Q.] reports the incident resulted in a loss of friends, a period of extremely poor eating, of going to Port Authority and considering suicidal ideation, of a fear of further suspicion and rumors that will harm her reputation.

[L.Q.] reports these extreme feelings regarding 'asking for it' and 'going back for more' in the alleged relationship. She denies any need on her part to prevent something like this alleged relationship with a teacher from happening to someone else. She reports not caring if he is punished. She knows that she'll feel extremely depressed and suicidal as she did in September and October, should she have to appear in court or before a Grand Jury.

In his evaluation the doctor found among other things:

... At the present time, she does not appear to be suicidal, though she may become involved in a self-fulfilling prophecy of suicidal ideation should she testify in Court or before a Grand Jury. The significant resources that exist should be marshalled should her testimony be required. The emotional liability demonstrated by [L.Q.], the discrepancies between her verbalized need and the perceptions of her parents, her severe projection of the dire consequences of her testimony and public humiliation and ridicule, and her strong fear that this

> will somehow destroy her ability to survive as a person should be considered regarding any further involvement....
>
> There is no ability to predict how [L.Q.] may react on an impulsive moment should this testifying possibility come about. However, her MAPI results suggest a strong motivation to religious values and conventional behavior that should serve [L.Q.] well in this circumstance.

On December 4, 1987, a grand jury subpoena *ad testificandum* was served upon L.Q.'s lawyer. On January 27, 1988, the trial judge entertained a petition for an order to show cause to quash the subpoena which he treated as a motion to quash the subpoena. The judge heard arguments of counsel, reviewed the certification of L.Q.'s father, and the reports of Dr. Mischel, Rev. Clarke and Dr. Bender, and assumed that if called they would testify as to the contents of their reports. However, L.Q.'s attorney suggested that the judge hear from those persons who had made professional evaluations as to her health even though he agreed they probably would testify substantially in accord with their reports.

At first the judge viewed the question to be whether he had the authority as a matter of law to quash the subpoena. He noted that, although he could set the matter down for a hearing, it seemed to him a complete waste of time. Then the judge said: "Is there any good reason why I shouldn't say aye or nay today with reference to the quashing of the subpoena?" When the motion judge persisted in his view that the matter was one of law as to whether or not he had the authority to quash the subpoena, the prosecutor stated: "Obviously the court has authority to quash subpoenas when the bases for quashing the subpoena is laid before the Court." The prosecutor placed the issue in terms of "the competency of a witness," laying upon the witness the burden of showing she is incompetent as a witness.

The motion judge noted that L.Q. had shown suicidal tendencies in the past and that the latest report before him was dated July 1987, almost seven months before the hearing, but concluded:

> There has to come a time when the Petitioner and her family are going to have to face the facts. As we discussed in chambers, one of the things that troubles me, the reaction of this young lady is no different than any other sexual assault. I don't say that in any demeaning way whatsoever. I say it in a very sympathic way. But there comes a time that at the risk of sounding like a male chauvinist, we all have to recognize its a fait accompli and pick up our lives and go on from there.

The judge concluded:

> So it's a very delicate, but a very serious balancing act which the Court is called upon to do. We are back to whether or not I should sign the Order to Show Cause and I don't think you have the causes, very bluntly.

The order entered on February 5, 1988 denying the petition was stayed by the motion judge until February 16, 1988 to permit L.Q. and her parents to appeal. We granted leave to appeal on March 15, 1988 and we now reverse and remand.

No person has a privilege to refuse to be a witness except as provided by the Rules of Evidence or by other law of this State. *Evid.R.* 7(b). The prosecutor may issue a subpoena to a witness to appear and testify before a grand jury pursuant to *R.* 1:9-1. *See State v. Hilltop Private Nursing Home*, 177 *N.J. Super.* 377, 389 (App.Div.1981). Although the powers of a grand jury are not unlimited and are subject to the supervision of a judge, the "longstanding principle that 'the public ... has the right to every man's evidence,' except for those persons protected by a constitutional, common law or statutory privilege, [citations omitted] is particularly applicable to grand jury proceedings." *Branzburg v. Hayes*, 408 *U.S.* 665, 688, 92 *S.Ct.* 2646, 2660, 33 *L.Ed.*2d 626, 644 (1972).

There is no doubt that any witness who is subpoenaed to testify is affected with respect to his or her private rights. In the balancing of private interest with the public interest, however, the weight is in favor of the public, provided there is no abuse of power. *Application of Tiene*, 19 *N.J.* 149, 164–165 (1955). In that case, in concluding that the public interest is paramount to any personal right of privacy, the Supreme Court quoted the following excerpts from *Wigmore on Evidence:*

> For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwick) has a right

to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. (Cases cited and quoted.) * * * From the point of view of the duty here predicated, it emphasizes the sacrifice which is due from every member of the community. * * * Or the sacrifice may be of his privacy, of the knowledge which he would preferably keep to himself because of the disagreeable consequences of disclosure. * * * When the course of justice requires the investigation of the truth, no man has any knowledge that is rightly private. All that society can fairly be expected to concede is that it will not exact this knowledge when necessity does not demand it, or when the benefit gained by exacting it would in general be less valuable than the disadvantages caused; * * * From the point of view of society's right to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole,—from justice as an institution, and from law and order as indispensable elements of civilized life. * * * It follows, on the other hand, that all privileges of exemption from this duty are exceptional, and are therefore to be discountenanced. There must be good reason, plainly shown, for their existence. * * * On the other hand, if this duty exists for the individual to society, so also he may fairly demand that society, so far as the exaction of it is concerned, shall make the duty as little onerous as possible. [8 *Wigmore on Evidence*, (3rd ed. 1940) § 2192 and McNaughton rev. 1961.] [19 *N.J.* at 164.]

L.Q. and her parents ask the court to order the prosecutor not to proceed with the grand jury's investigation in this matter. In our criminal justice system the government retains broad discretion as to whom to prosecute. So long as the prosecutor has probable cause to believe the accused committed an offense defined by statute, the decision of whether or not to prosecute and what charge to file or bring before a grand jury generally rests entirely in his discretion. *Wayte v. United States*, 470 *U.S.* 598, 607, 105 *S.Ct.* 1524, 1530, 84 *L.Ed.*2d 547, 555–556 (1985). The prosecutor's broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. The broad discretion, while not unfettered, is only subject to constitutional restraints (*i.e.*, the decision not to prosecute may not be deliberately based on an unjustifiable standard such as race, religion or other arbitrary classification). *Id.* at 608, 105 *S.Ct.* at 1531, 84 *L.Ed.*2d at 556.

■    Next, L.Q. and her parents allege that her status as an underage victim of sexual assault, who has suicidal ideation, permits her to assert a "qualified privilege" not to testify before the grand jury.  However, she cites no statutory, constitutional or common law authority for such a privilege.  Privileges not to testify are set forth in the Rules of Evidence, *Evid.R.* 23-40 and in the statute, *N.J.S.A.* 2A:84A-17 *et seq.* We find no support for the claim of a qualified privilege as asserted by L.Q.

L.Q. also refers to the Crime Victim's Bill of Rights (*N.J.S.A.* 52:4B-34 to 38) in support of her proposition that such a privilege should exist.  However, that legislation provides in part:

> The Legislature finds and declares that without the participation and cooperation of crime victims and witnesses the criminal justice system would cease to function.  [*N.J.S.A.* 52:4B-35]

While that legislation is designed to enhance and protect the necessary role of crime victims, nothing in it suggests that a victim has the option not to testify.

It is asserted on L.Q.'s behalf that requiring her to testify would be detrimental to her emotional and mental well-being. It is argued that L.Q. may commit suicide if compelled to testify in this matter.  This argument is supported by the opinions of the school psychologist, Dr. Mischel and Rev. Clarke. For this reason, the prosecutor arranged for Dr. Bender's examination.  However, to us, his opinion appears equivocal. The prosecutor labels L.Q.'s contention in terms of her competency as a witness.  While the claim does not fall specifically within the concept of competency as a witness, *see N.J.S.A.* 2A:81-1 *et seq.*, it is somewhat akin to it.  *See* Disqualification of Witness, *Evid.R.* 17 (for infancy, mental disability and the like).  The determination of whether a person is competent to be a witness lies within the discretion of the trial judge.  *State v. R.W.*, 104 *N.J.* 14, 19 (1986).

■    We agree with L.Q. and her parents, as does the prosecutor, that the judge possesses the power, similar to the

discretionary power to determine the competency of a witness, to quash a subpoena for a witness' testimony if he concludes that the witness' mental, physical or emotional health will be substantially impaired. We conclude that the witness must first make a prima facie showing that such result will occur if the witness is required to testify. Once such a prima facie showing has been made, the trial judge shall conduct a hearing at which the burden is upon the witness to prove by clear and convincing evidence that his or her mental, physical or emotional health will be substantially impaired if required to testify.

■ We believe under the facts in this case that L.Q. and her parents have made such a prima facie showing and that a plenary hearing should be conducted. As noted by the judge, the most recent report before him, that of Dr. Bender, was more than six months old at the time of the hearing on January 27, 1988. On the remand herein ordered, L.Q. and her parents shall submit current reports as to the potential effect that testifying will have upon her mental, physical or emotional health. If required by the prosecutor, L.Q. shall submit to further examination by Dr. Bender or any other professional selected by the State. In the discretion of the judge, the hearing may be held either *in camera* or in open court.

■ We underscore that it is the obligation of all persons to appear and give testimony before courts and grand juries in the absence of a recognized privilege not to testify. Any further exemption is sharply circumscribed and will only occur where the witness demonstrates by clear and convincing proof that requiring him or her to testify will have some extremely detrimental effect on his or her mental, physical or emotional health beyond that suffered by any witness who is required to give testimony in any proceeding.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.