627 A.2d 624

KATHLEEN CUPANO, BOBBIE BROWN, JR., DONALD RUSSO, JOSEPH VINCZE, YIRGU WOLDE, AND THE NEW DEMO-CRATS, PLAINTIFFS–RESPONDENTS, v. ROBERT W. GLUCK, PROSECUTOR MIDDLESEX COUNTY, DEFENDANT–APPEL-LANT.

Argued February 17, 1993—Decided July 22, 1993.

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for appellant (*Robert W. Gluck,* Middlesex County Prosecutor, attorney).

*Giuffre M. Hollingsworth* argued the cause for respondents (*Carmichael and Anderson,* attorneys).

*Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal probes the reach of a county prosecutor's authority to investigate alleged election-law violations before receiving a referral from the Election Law Enforcement Commission (ELEC). The trial court refused to grant a permanent restraint of the defendant Prosecutor's investigation and to quash subpoenas that the Prosecutor's office had issued in connection with that investigation. The Appellate Division granted leave to appeal and entered an Order staying the investigation until ELEC had concluded its investigation and issued a report.

We granted leave to appeal, 130 *N.J.* 589, 617 *A.*2d 1215 (1992), and now vacate the Order of the Appellate Division.

I

Attempting to split the Democratic party in New Brunswick, several residents of that City formed a political organization known as the "New Democrats." The New Democrats created a ticket for positions on the City Council in the June 2, 1992, Democratic primary, to run against the ticket supported by the traditional Democratic organization in New Brunswick known as the "Regular Democrats."

Shortly before May 29, 1992, the New Democrats paid Wayne Dibofsky, a lobbyist for the New Jersey Education Association, $3,500 as a consulting fee, which was reported to ELEC as "consulting costs." In an interview with the *Home News,* a local newspaper, Dibofsky revealed that he had used the $3,500 to pay an anonymous printer who had done some work for the New Democrats' campaign. If Dibofsky did indeed make an anony-

mous campaign payment, that payment could be construed as violating section 20 of the Campaign Contributions and Expenditures Reporting Act, *N.J.S.A.* 19:44A–1 to –47 (the Act), which prohibits anonymous campaign contributions and expenditures.

On May 29, 1992, after reading the account of the interview with Dibofsky, the Chairman of the Regular Democrats requested that Frederick Herrmann, the Executive Director of ELEC, investigate whether the election laws had been violated. The Chairman also sent a letter to Robert W. Gluck, the Middlesex County Prosecutor, requesting an "early investigation by [his] office into circumstances involving the 'New Democrats' campaign organization in New Brunswick."

On May 30, 1992, another article appeared in the *Home News,* which included an alleged statement by Joseph Vincze, campaign manager for the New Democrats, that a new report would be prepared and filed with ELEC identifying the printer who had accepted the payment from Dibofsky. As part of the investigation by the Middlesex County Prosecutor's Office, an investigator spoke with Vincze regarding the statements he had made in the *Home News* article. Vincze allegedly told the investigator that no new report would be filed.

On June 2, 1992, the investigator prepared subpoenas directed to plaintiff Vincze and to plaintiff Yirgu Wolde, treasurer of the New Democrats, to produce various campaign-related documents, including those related to printing, as well as samples of all campaign literature printed for the New Democrats' campaign. Those subpoenas called for the documents to be delivered before a Middlesex County Grand Jury on June 9, 1992.

Plaintiffs filed a Verified Complaint in the Law Division, seeking to stay temporarily the Prosecutor's investigation and to quash the subpoenas that the Prosecutor's office had issued. On June 9, 1992, the court granted that motion and also issued an Order to Show Cause why the restraint should not be made permanent. On June 16, 1992, the court denied plaintiffs' application for permanent relief, noting that *N.J.S.A.* 19:34–62, which provides

that a prosecutor in a first-class county may not exercise the authority of the Superintendent of Elections to investigate alleged violations of election laws in such counties, did not apply here because Middlesex County is a county of the second class. (Counties are classified according to population and population density. See *N.J.S.A.* 40A:6–1).

On June 17, 1992, the Prosecutor issued subpoenas that required plaintiffs Brown, Cupano, Russo, Vincze, and Wolde, as well as Dibofsky, to present the campaign-related documents to the grand jury. On that same day plaintiffs filed an emergent application to the Appellate Division for leave to appeal the denial of permanent relief, arguing that the Prosecutor had exceeded his authority by initiating the investigation without awaiting a recommendation from either ELEC or the Middlesex County Election Commission. Additionally, plaintiffs contended that the Prosecutor should have been precluded from participating in this matter because he is the former law partner of Thomas Kelso, the Executive Director of the Regular Democrats. Finally, plaintiffs argued that the subpoenas were overbroad in that many of the documents requested concerned issues that were irrelevant to the alleged illegal payment to lobbyist Dibofsky.

The Appellate Division granted plaintiffs' emergent application, stayed the Law Division order of June 16, 1992, and summarily reversed it. The Appellate Division reinstated the temporary stays that had been imposed on June 9, 1992, and directed that the stays continue until ELEC issued its report and recommendations regarding the alleged violations, pursuant to *N.J.S.A.* 19:44A–6b(10). That statutory section authorizes ELEC to "[f]orward to the Attorney General or to the appropriate county prosecutor information concerning any violations of this act [that] may become the subject of criminal prosecution or [that] may warrant the institution of other legal proceedings by the Attorney General." The order also provided that "[i]n the event of a further application by the county prosecutor subsequent to action or unreasonable inaction by the Commission, the Law Division shall hold a hearing to determine the proper scope of the investigation to be

undertaken by the prosecutor." The court ordered the trial court to limit the breadth of any subpoenas to items and information required to further the grand jury's consideration of election-law violations or wrongdoings, while simultaneously protecting the confidentiality of individual contributors. Lastly, the order provided that the Assignment Judge or his designee inform the grand jury of its right, pursuant to *N.J.S.A.* 52:17B–106, to request that the Attorney General supersede the Prosecutor in conducting the investigation. (At oral argument the Deputy Attorney General informed us that the "corruption unit" in the Department of Law and Public Safety had, at the Prosecutor's request, reviewed the matter and had found no reason to interfere in the investigation or otherwise to participate in the matter.)

On this appeal the Prosecutor claims that the Appellate Division erred in two ways: (1) because Middlesex County is not a county of the first class, *N.J.S.A.* 19:34–62 does not require that the Prosecutor await the result of ELEC's inquiry before investigating alleged election-law violations; and (2) limiting the breadth of the subpoenas and ordering a hearing to determine the scope of any investigation undertaken by the Prosecutor's Office is beyond the court's authority and improperly interferes with the Prosecutor's function as chief law-enforcement officer.

We also granted the motion to appear as *amicus curiae* by the Attorney General, who argues that the Appellate Division's ruling violates the separation-of-powers doctrine.

## II

Violations of our election laws have both criminal and civil consequences. Prosecutors are obligated to investigate the criminal aspects of those violations, *N.J.S.A.* 19:34–62, and in the absence of supersession by the Attorney General, the prosecutor's authority to conduct such investigations is exclusive. *See N.J.S.A.* 19:34–62; *N.J.S.A.* 52:17B–109; *Morss v. Forbes,* 24 *N.J.* 341, 369–70, 132 *A.*2d 1 (1957); *State v. Walls,* 138 *N.J.Super.* 445, 449, 351 *A.*2d 379 (App.Div.1976). The Legislature has given the power to

investigate the civil consequences of such violations to two independent administrative bodies: the office of the Superintendent of Elections, and ELEC. Due to the parallel jurisdiction of county prosecutors, the Attorney General, ELEC, and Superintendents of Elections, concurrent criminal and civil investigations may occur, see *In re Garay*, 89 *N.J.* 104, 111, 444 *A*.2d 1107 (1982), with one very limited exception, namely, in first-class counties the county prosecutor may not exercise the powers of the Superintendent of Elections. *N.J.S.A.* 19:34–62; *Ruvoldt v. Tumulty*, 107 *N.J.Super.* 545, 554, 259 *A*.2d 491 (Law Div.), *aff'd o.b.*, 107 *N.J.Super.* 494, 259 *A*.2d 465 (1969).

In 1930, the Legislature enacted *N.J.S.A.* 19:32–1, which created Superintendents of Elections in first-class counties. (*N.J.S.A.* 19:32–26 permits second- and fifth-class counties to create the office of Superintendent of Elections; however, Middlesex County has not created such an office.) Superintendents are "administrative expert[s] in election matters." *Ruvoldt, supra*, 107 *N.J.Super.* at 554, 259 *A*.2d 491. Their duties concern the fundamental operation of an election, *e.g.*, regulating ballot boxes, *N.J.S.A.* 19:32–34; maintaining custody of voting machines, *N.J.S.A.* 19:32–49; and ensuring non-interference with the lawful conduct of the election, *N.J.S.A.* 19:32–48. Moreover, superintendents are required to "investigate all complaints relating to the registration of voters," *N.J.S.A.* 19:32–5, and are empowered "to issue subpenas [sic] for the purpose of investigating any complaint of violation of the election laws of the state * * *." *N.J.S.A.* 19:32–6. Finally, *N.J.S.A.* 19:34–62 provides: "Nothing herein contained shall justify any such prosecutor in counties of the first class in exercising the powers conferred upon the superintendent of elections in such counties."

In 1973, the Legislature enacted the New Jersey Campaign Contributions and Expenditures Reporting Act, *N.J.S.A.* 19:44A–1 to –47, as a major governmental reform. That Act

regulates campaign expenditures by candidates for political office and imposes a wide range of restraints, including financial reporting and disclosure, upon persons

who seek to influence the election of political candidates, the outcome of elections for the passage or defeat of public questions, and the content and fate of legislation. [*New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 62, 411 *A.2d* 168 (1980).]

The legislation created ELEC to enforce the Act's provisions. *N.J.S.A.* 19:44A–5, 6b. ELEC is empowered to conduct hearings in respect of possible violations of the statute, to "issue subpenas [sic] for the production of documents and the attendance of witnesses," *N.J.S.A.* 19:44A–6b(9), to impose penalties, and to "initiate a civil action in any court of competent jurisdiction for the purpose of enforcing compliance with the provisions of this act or enjoining violations thereof or recovering any penalty prescribed by this act." *N.J.S.A.* 19:44A–6b. Among other things, ELEC is authorized to forward to the Attorney General or county prosecutor any information regarding violations that may be appropriate for criminal prosecution. *N.J.S.A.* 19:44A–6b(10); *see, e.g., In re Application For Disclosure of Grand Jury Testimony*, 124 *N.J.* 443, 447, 591 *A.2d* 614 (1991) (reciting that when ELEC determined that alleged illegal conduct warranted criminal prosecution, it referred matter to Attorney General and discontinued investigation). Unlike the 1930 enactment, the Act contains no provision prohibiting the prosecutors from exercising any powers conferred on an administrative body.

Even though Middlesex County is not a first-class county and does not have a Superintendent of Elections, the effect of the Appellate Division order was to give ELEC the primary authority to investigate the allegations concerning the payment to lobbyist Dibofsky. We disagree with that result.

In the area of election-law violations the Legislature has circumscribed a prosecutor's investigatory power in only a very limited instance, as set forth in *N.J.S.A.* 19:34–62. The Legislature could have limited a prosecutor's power by providing ELEC with primary authority similar to that of Superintendents in first-class counties. *Cf. N.J.S.A.* 52:17B–106, –107 (outlining conditions under which Attorney General may supersede county prosecutor). Instead, the Legislature created ELEC as an administrative body

to share concurrently with an executive body the duty to investigate election-law violations. Although the Act explicitly authorizes ELEC to notify a county prosecutor or the Attorney General of information regarding election-law violations that may result in criminal prosecution, it contains no specific legislative prohibition, such as that found in *N.J.S.A.* 19:34–62, against initiating such an investigation without a referral from ELEC. In the absence of such a provision, the Prosecutor's authority to investigate alleged election-law violations is not superseded by ELEC. *Cf. United States v. Tonry,* 433 *F.Supp.* 620, 622–23 (E.D.La.1977) (holding that Federal Election Campaign Act does not prohibit Attorney General from conducting criminal investigation into alleged election-laws violations without referral from Federal Election Commission).

## III

The principle of separation of powers, as set forth in our Constitution, is that "[t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." *N.J. Const.* art. III, para. 1. A number of cases describe the purpose of that constitutional provision. "The separation of powers is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital." *State v. Abbati,* 99 *N.J.* 418, 434, 493 *A.*2d 513 (1985). The doctrine "has nowhere been construed as creating three mutually exclusive watertight compartments." *Massett Building Co. v. Bennett,* 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950); *see also In re Salaries for Probation Officers,* 58 *N.J.* 422, 425, 278 *A.*2d 417 (1971) (stating that "the doctrine of separation of powers was never intended to create, and certainly never did create, utterly exclusive spheres of competence"). "[B]lendings are permitted so long as there is no impairment of ' "the essential integrity of one of the great branches of government." ' " *In re Investigation Regarding*

*Ringwood Fact Finding Comm.*, 65 *N.J.* 512, 519, 324 *A.2d* 1 (1974) (quoting *Morss, supra,* 24 *N.J.* at 372, 132 *A.2d* 1 (quoting *Massett, supra,* 4 *N.J.* at 57, 71 *A.2d* 327.)) Because "the doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission," *Brown v. Heymann,* 62 *N.J.* 1, 11, 297 *A.2d* 572 (1972), "in many circumstances branches share complimentary responsibilities to achieve a stated governmental objective." *State v. Lagares,* 127 *N.J.* 20, 27, 601 *A.2d* 698 (1992).

Prosecutors enjoy broad discretionary powers in selecting matters for prosecution. *In re Ringwood, supra,* 65 *N.J.* at 516, 324 *A.2d* 1; *State v. McCrary,* 97 *N.J.* 132, 142, 478 *A.2d* 339 (1984); *State v. Laws,* 51 *N.J.* 494, 510, 242 *A.2d* 333, *cert. denied,* 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.2d* 384 (1968); *In re L.Q.,* 227 *N.J.Super.* 41, 48, 545 *A.2d* 792 (App.Div.1988). "The strength and independence of the prosecutor's office has always been respected and accorded wide deference." *Abbati, supra,* 99 *N.J.* at 433, 493 *A.2d* 513; *see also McCrary, supra,* 97 *N.J.* at 142, 478 *A.2d* 339 (stating that prosecutor's conduct has been accorded presumption of validity). "The prosecutor's broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *In re L.Q., supra,* 227 *N.J.Super.* at 48, 545 *A.2d* 792. Nevertheless, the prosecutor's discretion "is not unregulated or absolute," *State v. Winne,* 12 *N.J.* 152, 172, 96 *A.2d* 63 (1953), and "it has never been regarded as free from judicial supervision and control." *Abbati, supra,* 99 *N.J.* at 433–34, 493 *A.2d* 513; see, *e.g., N.J.S.A.* 40A:5–22 (allowing judge of Superior Court to conduct investigation into affairs of any county or municipality); *State v. Vasquez,* 129 *N.J.* 189, 196, 609 *A.2d* 29 (1992) (requiring prosecutor to articulate on record reasons for waiving or refusing to waive parole disqualifier); *Lagares, supra,* 127 *N.J.* at 28, 601 *A.2d* 698 (holding that judiciary retains power to review prosecutor's decision to select certain defendants convicted of drug offenses for enhanced terms of imprisonment); *In re Application of Burlington County Board of Chosen Freeholders,* 99 *N.J.* 90, 491 *A.2d* 631 (1985) (affirming that sheriff is county employee subject to court-supervised investigation al-

though he is State officer as well); *State v. Cichetto*, 144 *N.J.Super.* 236, 238–39, 365 *A.*2d 207 (App.Div.1976) (dismissing indictment for unreasonable delay in presentment of charges to grand jury).

The prosecutor's decision to prosecute is reviewed for arbitrariness or abuse of discretion. *In re Ringwood, supra*, 65 *N.J.* at 516, 324 *A.*2d 1; *State v. LeVien*, 44 *N.J.* 323, 327, 209 *A.*2d 97 (1965); *State v. Muller*, 246 *N.J.Super.* 518, 523, 588 *A.*2d 393 (App.Div.1991). That heightened standard of review cautions our hesitancy in brooking any more than a minimal intrusion into the area of prosecutorial discretion. *McCrary, supra*, 97 *N.J.* at 142, 478 *A.*2d 339; *see State v. Leonardis*, 73 *N.J.* 360, 388, 375 *A.*2d 607 (1977) ("A prosecutor who is affirmatively prosecuting a criminal suspect when probable cause has been found is patently performing his duty to enforce the criminal law. It would be an arrogation of authority for a court to tell him to exercise his discretion differently (*i.e.*, not to prosecute.") (citation omitted)); *Walls, supra*, 138 *N.J.Super.* at 450, 351 *A.*2d 379 ("In the area of criminal prosecutions, the court has a duty to refrain from imposing a burden upon the prosecutor which will handicap his administration of the cause of justice."). In respect of election-law violations, prosecutorial discretion is subjected to closer scrutiny than is the discretion exercised in other areas of criminal violations. *In re Ringwood, supra*, 65 *N.J.* at 524, 324 *A.*2d 1 (Pashman, J., concurring and dissenting in part).

> This departure from the practice in other instances is necessary so as to preclude any one branch from successfully preventing the disclosure of circumstances attending alleged violations. Absent this disclosure to the judicial branch, enforcement of election laws would be left to those whose election or appointment may have been facilitated by contravention of the very laws which they are now entrusted to enforce.

[*Ibid.*]

IV

We conclude that the Prosecutor's decision to investigate the allegations regarding plaintiffs' violations of the election laws

was neither an abuse of discretion nor arbitrary. On this record, we cannot say that the Prosecutor's motives are tainted by his relationship to the Executive Director of the Regular Democrats, his former law partner. *Cf. State v. Rosengard,* 47 *N.J.* 180, 182, 219 *A.*2d 857 (1966) (holding that circumstance that defendant occupied public office, Jersey City Clerk, from which prosecutor had taken leave of absence and which he was free to reclaim, "did not demonstrate that the Prosecutor and his staff could not handle the matter with fairness and the appearance of fairness"), *rev'g* 89 *N.J.Super.* 28, 213 *A.*2d 262 (Law Div.1965).

Furthermore, we view as inappropriate the Appellate Division's attempt to limit, in an anticipatory manner, the scope of the Prosecutor's investigation and the breadth of the subpoenas issued by his office. If plaintiffs object to the reach of the Prosecutor's subpoenas, they may seek redress through *Rule* 1:9–2, which permits the court to modify or quash a subpoena if compliance would be unreasonable or oppressive. *See In re Grand Jury Subpoena Duces Tecum,* 143 *N.J.Super.* 526, 636–39, 363 *A.*2d 936 (Law Div.1976) (holding that subpoenaed documents must bear some "possible" relationship to matter being investigated, description of documents must not be unreasonably vague and nonspecific, and period of time within which subpoenaed documents are concerned must be reasonable).

We conclude that county prosecutors have parallel authority with legislatively-created administrative agencies to investigate election-law violations in all counties other than first-class counties. Because the Legislature has failed to provide ELEC with primary authority concerning all alleged violations of the Act, the Prosecutor need not await a referral from ELEC before initiating an investigation. The Prosecutor has neither acted arbitrarily nor abused his discretion in initiating and conducting this investigation.

Complaints of voting irregularity are frequently presented to prosecutors on the eve of an election. When the matter is within the prosecutor's jurisdiction, a prosecutor is duty-bound to investi-

gate sufficiently to assure that no violation of law has occurred. Our intuition and experience tells us that prosecutors are acutely aware of the need to guard against the manipulation of the criminal process by political forces. In this case, although the grand-jury subpoenas were not made returnable until *after* the election, the media appear to have learned of the inquiry. As we were informed following oral argument, after ELEC had concluded its investigation, it "found that the 'purpose' of the [Dibofsky] disbursement should have been amplified," and it directed the New Democrats' committee to file an amended report identifying which vendors had been paid from the $3500 disbursement.

V

The Order of the Appellate Division is hereby vacated.

*For Vacation*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI, and STEIN— 6.

*Opposed* —none.